**E.K. WILCOX, Jr., Petitioner-Appellee, Cross-Appellant,**

**v.**

**J. Paul FORD, Warden, Respondent-Appellant, Cross-Appellee.**

**No. 86–8060.**

United States Court of Appeals, Eleventh Circuit.

April 3, 1987.

1142

William B. Hill, Jr., Sr. Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Bobby Lee Cook, Summerville, Ga., Wilby C. Coleman, Valdosta, Ga., James F. Wyatt, III, Charlotte, N.C., for petitioner-appellee, cross-appellant.

Before FAY and JOHNSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This is an appeal taken by Warden J. Paul Ford from a district court order granting habeas corpus relief to appellee E.K. Wilcox, Jr., 626 F.Supp. 760 (1985). Ford also appeals the district court's decision to grant bail to Wilcox. Wilcox cross-appeals the district court's dismissal of the remaining claims in his petition. We reverse the portion of the district court's opinion granting habeas corpus relief, affirm the portion of the district court's opinion denying habeas corpus relief, and reverse the district court's order granting bail to the appellee.

E.K. Wilcox, Jr., was indicted by a grand jury in Lowndes County, Georgia, in March 1981 for the murder of Hellen Hanks and the unlawful concealment of her death. Wilcox was tried before a jury and found guilty on both counts. A summary of the critical facts developed at trial is attached to this opinion as an appendix. Wilcox was sentenced to life imprisonment for the murder and to a consecutive twelve month sentence for unlawful concealment of a death.

Wilcox appealed to the Supreme Court of Georgia. His conviction was affirmed. *Wilcox v. State*, 250 Ga. 745, 301 S.E.2d 251 (1983). He then filed a writ of habeas corpus in the Superior Court of Muscogee County, Georgia. The court held a hearing on the petition for relief on November 17, 1983. The petition was denied on March 9, 1984. The Supreme Court of Georgia then denied Wilcox's application for a certificate of probable cause to appeal the decision of the state habeas court.

Wilcox filed an application for a writ of habeas corpus in the United States District Court for the Middle District of Georgia on September 17, 1984. The application set forth six grounds for relief: 1) the state obtained his conviction with insufficient evidence; 2) the police investigation of the crime involved police misconduct so fundamentally unfair that it violated due process; 3) the trial court improperly prohibited Wilcox's counsel from questioning two veniremen concerning their leanings as to which party ought to prevail; 4) the trial court erred in failing to strike for cause two veniremen who admitted on voir dire that they had a preconceived notion that Wilcox was guilty; 5) the admission of testimony coerced from two Wilcox employees (Wrentz and Marshall) violated Wilcox's due process rights; and 6) the false answer during voir dire of a venireman eventually selected to sit as a juror violated Wilcox's Sixth Amendment and due process rights.[1]

On July 9, 1985, the district court held an evidentiary hearing on the question of whether Wrentz's and Marshall's testimony had been coerced. On December 20, 1985, the district court granted the application for habeas relief. Ten days later, on December 30, 1985, the federal habeas court also ordered that Wilcox be released on bond.

The district court granted the writ on the first two grounds for relief asserted in the petition and dismissed the other four claims as meritless. The district court held that

1. This is the only grounds for relief asserted in the petition for habeas corpus that is not assert- ed before this court on appeal.

the *Jackson v. Virginia*[2] standard was not satisfied by the evidence presented in this case because no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. The court concluded that the evidence was insufficient for two reasons: 1) the evidence at trial presented an alternative hypothesis to explain Hellen Hanks' death, and that hypothesis raised a reasonable doubt as to Wilcox, Jr.'s guilt; and 2) the only testimony linking Wilcox, Jr., with Hellen Hanks' death, the testimony of Ed Wrentz, could not be accepted as true by a rational trier of fact. The court further concluded that, since the writ was issued on grounds of insufficiency of evidence, the state would be barred from retrying Wilcox.

The district court held in the alternative that the police misconduct in the case in interrogating Wrentz and Marshall "shocked the conscience", thereby violating due process. As a result, the court held, Wilcox would be entitled to a new trial even if there had been sufficient evidence to convict Wilcox under *Jackson v. Virginia*.

### Sufficiency of the Evidence

Warden Ford's first contention on appeal is that the district court erred in concluding that the evidence adduced at trial was insufficient to support Wilcox's conviction. In the seminal case of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court stated that our task in addressing such a claim on habeas review is to determine whether any rational trier of fact would have found proof of guilt beyond a reasonable doubt. 443 U.S. at 319, 99 S.Ct. at 2789; *see Stoner v. Graddick*, 751 F.2d 1535, 1547 (11th Cir.1985); *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215 (11th Cir.1983). In applying this test, we must review the evidence in the light most favor-

able to the prosecution. *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. at 2789; *Stoner, supra,* 751 F.2d at 1547; *Cosby v. Jones,* 682 F.2d 1373, 1379 (11th Cir.1982).

The federal courts have consistently reiterated that this standard for weighing the constitutional sufficiency of the evidence is a limited one. *See, e.g., Martin v. State of Alabama,* 730 F.2d 721, 724 (11th Cir.1984). It is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Jackson, supra,* 443 U.S. at 326, 99 S.Ct. at 2792; *Martin, supra,* 730 F.2d at 724. Faced with a record of historical facts that supports conflicting inferences, we must presume that the jury resolved such conflicts in favor of the prosecution, deferring to the jury's judgment as to the weight and credibility of the evidence. *See Jackson, supra,* 443 U.S. at 326, 99 S.Ct. at 2792; *Machin v. Wainwright,* 758 F.2d 1431, 1435 (11th Cir.1985); *Cobb v. Wainwright,* 666 F.2d 966, 971 (5th Cir.), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief. *Martin, supra,* 730 F.2d at 724; *Cosby, supra,* 682 F.2d at 1383 and n. 21.[3]

In determining whether the facts of a particular case satisfy the *Jackson* standard, it is necessary to refer to the essential elements of the crimes as defined by state law. *See Jackson, supra,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16; *Buffo v. Graddick,* 742 F.2d 592, 595 (11th Cir. 1984). The crimes charged in this case are murder and unlawful concealment of a death. Under Georgia law, "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. § 16–

---

**2.** 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**3.** Furthermore, the state court's findings of facts are entitled to a presumption of correctness. 28 U.S.C.A. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The issue of whether the state court's findings are

sufficient to support a conviction under the *Jackson* standard is a mixed question of law and fact subject to plenary review. *Grizzell v. Wainwright,* 692 F.2d 722, 725 (11th Cir.1982), *cert. denied,* 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983).

5–1(a) (1981); *see Holloway v. McElroy,* 474 F.Supp. 1363, 1367–68 (M.D.Ga.1979), *aff'd,* 632 F.2d 605 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981). Express malice is defined as the "deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." *Id.* at § 16–5–1(b). Implied malice exists "where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." *Id.* A person commits the misdemeanor of concealing death if "by concealing the death of any other person, [he] hinders a discovery of whether or not such person was unlawfully killed." O.C.G.A. § 16–10–31.[4]

■ Appellee E.K. Wilcox, Jr., argues that the evidence at trial was insufficient to support his conviction on two grounds: 1) the evidence does not satisfy the *Jackson v. Virginia* standard because it gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence; and 2) even if the evidence as a whole meets the *Jackson* standard, the court should disregard the testimony of Ed Wrentz as incredible, and without the testimony of Wrentz there is clearly insufficient evidence to convict Wilcox of either crime. We reject both arguments and hold that the evidence presented by the State was clearly sufficient to support Wilcox's conviction for both murder and unlawful concealment of death.

Considering all of the evidence in a light most favorable to the prosecution, including the testimony of Ed Wrentz,[5] we find that it provided a sufficient basis for the jury to conclude that E.K. Wilcox, Jr., murdered Hellen Hanks and then concealed her death by surreptitiously burying her body in a field. The prosecution's expert medical testimony identified the body as Hellen Hanks and gave the jury a reasonable basis to conclude that Hanks had been strangled in connection with a sexual assault. Several witnesses testified that E.K. Wilcox, Jr., had been sexually harassing Hanks in the weeks prior to her murder and that she was afraid of him. Other witnesses gave testimony indicating that Wilcox, Jr., arrived at the Wilcox offices in Valdosta on the day of the murder at around 3:00 or 3:30 rather than at 4:15 or 4:30 as claimed by Wilcox, giving rise to the inference that Wilcox, Jr. and the victim were together at the Wilcox offices for some period of time in the afternoon. The evidence also showed that Wilcox did not report Hanks as missing until 4:45 or 5:00 that afternoon.

Furthermore, Wrentz's direct testimony gave the jury a basis to conclude that later that same evening, Wilcox, Jr., Wilcox, Sr., Wrentz and Marshall put Hanks' body in a wooden box belonging to Wilcox Advertising Company, dismembering her legs at the knees in order to fit her body into the box. The prosecution's expert medical witnesses supported Wrentz's testimony that Hanks' legs had been dismembered below the knee. Wrentz testified that the four men drove out into the country and buried the box, together with Hanks' clothes and various of her belongings, in the field where her body was discovered eight years later. Other evidence and testimony as to the physical condition of the burial site, the location of various items in and around the burial box, and the description of the site itself all corroborated Wrentz's description of the burial and the burial site. Finally, various witnesses identified the burial box and various items found in or around the box as belonging to Wilcox Advertising Company.

From this evidence, taken together with the rest of the evidence introduced at trial in support of the prosecution's case, we find that a reasonable jury could have concluded beyond a reasonable doubt that Wilcox, Jr., caused the death of Hellen Hanks with malice aforethought and that he hindered the discovery of the fact that she was unlawfully killed. The jury could have disbelieved the testimony of the two Wilcoxes and credited Wrentz's account of the

---

**4.** An individual can also be held criminally responsible for either crime under Georgia law if he aids or abets the commission of the crime. O.C.G.A. § 16–2–20.

**5.** *See* discussion *infra* as to whether Wrentz's testimony should be disregarded.

events of the evening of the murder, as well as crediting the testimony of Wilcox, Jr.'s ex-wife and other witnesses indicating that Wilcox, Jr.'s location and activities were unaccounted for during two prolonged periods of time the afternoon and evening of Hanks' disappearance.

■ While Wilcox introduced exculpating evidence on various points, we must presume that the jury resolved the conflicts in the evidence in favor of the prosecution. *Jackson, supra,* 443 U.S. at 326, 99 S.Ct. at 2792. Given our conclusion that the prosecution's evidence provides a sufficient basis for the conviction, conflicting evidence alone does not undermine that conclusion of sufficiency so long as a rational factfind-

er could have credited one side of the conflicting testimony over the other.[6] *See Stoner v. Graddick, supra,* 751 F.2d at 1547. We do not find that the evidence supporting Wilcox's defense is so strong that a rational factfinder would have necessarily credited his evidence over the prosecution's evidence or have entertained a reasonable doubt as to Wilcox's guilt. Rather, while the jury theoretically *might* have refused to convict Wilcox had they believed his story, the prosecution's evidence was enough to support a guilty verdict on both charges if the jury chose to credit that evidence over the defendant's evidence.[7]

■ Nor do we find that we could or should disregard the testimony of Ed

---

6. This is particularly true since a significant portion of Wilcox, Jr.'s defense is based upon his own testimony and the testimony of his father. The jury had a full opportunity to observe the demeanor and assess the credibility of both witnesses, and was free to assess and weigh their testimony based upon their observations.

7. The district court's finding that Wilcox was not convicted by sufficient evidence relies heavily on its conclusion that Wilcox is entitled to the protection of a Georgia evidentiary provision governing convictions based upon circumstantial evidence. O.C.G.A. § 24–4–6. That section provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, *but shall exclude every other reasonable hypothesis save that of the guilt of the accused.*" (emphasis added). *See Barnett v. State,* 153 Ga.App. 430, 265 S.E.2d 348, 350 (1980). The Georgia courts have held that an appellate court reviewing a conviction based on circumstantial evidence should not undertake to weigh the evidence, but should examine whether there is sufficient competent evidence to support the verdict when viewed in the light most favorable to the verdict. *Hopkins v. State,* 167 Ga.App. 811, 307 S.E.2d 707, 711 (1983); *Shockley v. State,* 166 Ga.App. 182, 303 S.E.2d 519, 520 (1983). The state courts have explained that O.C.G.A. § 24–4–6 "does not mean that the act by bare possibility could have been done by somebody else, but that the state must show to a moral certainty that it was the defendant's act." *Hopkins, supra,* 307 S.E.2d at 711 (quoting *Hunter v. State,* 91 Ga.App. 136, 85 S.E.2d 90, 92 (Ga.App.1954)).

While the appellant does not really challenge the district court's reliance on the state evidentiary statute, we believe it merits some discussion. The district court concluded that, under the higher standard of proof required by O.C.G.A. § 24–4–6, Wilcox was convicted based

upon insufficient evidence because the evidence at trial did not exclude every other reasonable hypothesis save that of Wilcox's guilt. Both the district court's reliance on the state provision in its analysis and its conclusion that the state standard was not satisfied are erroneous. Although O.C.G.A. § 24–4–6 is designated as a rule of evidence, in substance it is actually a standard of proof required for a conviction based upon circumstantial evidence. As a federal habeas court, our review of the petitioner's conviction is limited to a consideration of whether the evidence is sufficient *as a matter of federal constitutional law. See Jackson, supra,* 443 U.S. at 319–21, 99 S.Ct. at 2789–90; *Machin, supra,* 758 F.2d at 1434. In setting out the federal constitutional standard in *Jackson v. Virginia,* the Supreme Court expressly rejected the standard of proof now embodied in O.C.G.A. § 24–4–6, 443 U.S. at 326, 99 S.Ct. at 2792, and that state standard has no place in our sufficiency of the evidence analysis.

Furthermore, even if the petitioner's conviction was improper in light of the "higher" state standard, a federal habeas court is not concerned with violations of state law unless the violation raises federal constitutional problems. *See Machin, supra,* 758 F.2d at 1434; *Rodriguez, supra,* 740 F.2d at 886; *Corn v. Zant,* 708 F.2d 549, 555 (11th Cir.1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). We acknowledge, as have other courts, that a state conviction which meets the *Jackson* standard but does not meet a higher state standard may create a due process issue, *see Parker v. Procunier,* 763 F.2d 665, 666 n. 1 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 159, 88 L.Ed.2d 132 (1985); *Tarpley v. Estelle,* 703 F.2d 157, 162 n. 8 (5th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983); *Holloway v. McElroy, supra,* 662 F.2d at 640 n. 55, but we need not reach that issue here because we conclude that the "higher" state standard *was* satisfied in this case, contrary to the district court's conclusion.

Wrentz in reviewing the sufficiency of the evidence under the *Jackson* standard.[8] Wilcox argues that the sole evidence linking him to the crime, Wrentz's testimony, is so incredible that it cannot provide a rational basis for the verdict.[9] He argues that Wrentz's testimony was internally inconsistent, confused and contradicted by all of the other individuals allegedly involved in the body burying operation, Lorenzo Marshall, Wilcox, Jr., and Wilcox, Sr.

As discussed above, it is a firmly established principle of constitutional law that a defendant may not be convicted of a crime if the evidence presented at trial is insufficient to persuade a *rational* factfinder beyond a reasonable doubt that the defendant is guilty. *Jackson v. Virginia, supra,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis added); *United States v. Chauncey,* 715 F.2d 543, 546 (11th Cir.1983). Based upon *Jackson*'s "rationality" requirement, this Circuit has held that a reviewing court may disregard testimony when it is "so inherently incredible, so contrary to the teachings of human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt." *Chauncey, supra,* 715 F.2d at 546; *See United States v. Rivera,* 775 F.2d 1559, 1561 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986); *United States v. Garner,* 581 F.2d 481, 485–86 (5th Cir. 1978); *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976).

The issue before us now is whether Ed Wrentz's testimony is so "inherently incredible ... that no reasonable person would believe it beyond a reasonable doubt." While Wrentz's testimony was to some extent confused and self-contradicting, we find that the testimony he gave on direct examination is not at odds with ordinary common sense or physically impossible under the laws of nature. The account of events given by Wrentz very well could have occurred. More than that, many aspects of his testimony are corroborated by other evidence, such as the indications of dismemberment, the fact that it rained the night of August 31, and the description of the burial site. Furthermore, Wrentz's testimony as to the time of day the burial took place is consistent with the two periods of time during the day for which Wilcox, Jr., and Sr. were unaccounted except by their own testimony.

The credibility of Wrentz's testimony, with all of its contradictions and confusion, was properly a question for the jury. *See Rodriguez v. Wainwright,* 740 F.2d 884, 886 (11th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985). The jury made a collective decision to believe his testimony after observing him on the stand and hearing the defense's thorough cross-examination of his direct testimony. We leave that credibility determination with the jury, where it properly belongs, and conclude that Ed Wrentz's testimony was not incredible as a matter of law. Consequently, we adhere to our conclusion that the district court erred in evaluating the sufficiency of the evidence against Wilcox.

### Police Misconduct

Warden Ford's second argument on appeal is that the district court erred in its alternative holding that Wilcox was entitled to a new trial based on the fact that the police misconduct in this case violated his due process rights. The district court held that the "intimidation tactics" employed by the police in interrogating three employees of the Wilcox business, including Ed Wrentz, violated Wilcox's Fifth Amendment right to due process.[10] Upon careful-

---

**8.** The state conceded at oral argument that the evidence against Wilcox might indeed be insufficient if the testimony of Wrentz were disregarded.

**9.** The district court agreed with Wilcox, writing that "[given] Mr. Wrentz's inconsistent and at times incoherent testimony in light of the testimony given by Mr. Marshall and his corroborat-

ing witnesses, *it insults rational thought to attribute to Mr. Wrentz's testimony the degree of credibility necessary to justify a conviction for murder and life imprisonment.*" (emphasis in original).

**10.** The district court held an evidentiary hearing on this issue, reviewed transcripts from and

ly reviewing the record, however, we find that the district court erred in concluding that the police misconduct in this case was so egregious as to constitute a violation of Wilcox's due process rights.[11]

The district court held that outrageous government conduct occurred based on the police interrogation of three Wilcox Advertising Company employees: Wrentz, Marshall, and an employee that did not testify at trial, John Goodman. The district court concluded that the manner in which the investigating police officers interrogated these three men "shock[ed] [his] conscience." During the course of their interrogation the police officers told Goodman, a thirty-five year old black man, that they planned to hold him indefinitely and that they would "fry his ass". They also insinuated that they had found his fingerprints on the burial box. Goodman consistently denied knowing anything about Hellen's disappearance.

Both Marshall and Wrentz, however, initially stated that they did not know anything but eventually signed statements attesting to the hole digging story related above. Wrentz was a very old, illiterate black man with what one police officer described as the "old slave syndrome." The police officer testified that he discovered that Wrentz would agree to anything a white man asked him in a leading question format. The transcripts reflect that the interrogating officers threatened to charge Wrentz with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation.

Marshall received similar treatment. He was in his late sixties at the time of the interrogation and illiterate. Marshall was interrogated for eight and a half hours without being provided with food or water. The officers then threatened to send him to the electric chair along with two other Wilcox employees and also told him that he

would die in prison. He repeatedly told the officers that he was in Albany, Georgia, the week that Hanks disappeared and denied digging a hole. Marshall corroborated Wrentz's story only after the police brought Wrentz into the room and Wrentz repeated his story in front of Marshall. Marshall later recanted the statement and explained that he had only made it because he was afraid and wanted to go home.

Wilcox's due process claim derives from the United States Supreme Court case *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and its progeny. Based upon the general principle that criminal prosecutions must meet the bare minimum requirements of due process under the Fifth Amendment of the Constitution,[12] the Supreme Court in *Russell* recognized that a conviction could be overturned where government involvement in the investigation and prosecution of the crime is so outrageous that it violates "fundamental fairness, shocking to the universal sense of justice." *Russell, supra,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *see also Owen v. Wainwright,* 806 F.2d 1519, 1521 (11th Cir.1986) (per curiam); *United States v. Haimowitz,* 725 F.2d 1561, 1577 (11th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984). The question of whether government involvement in a criminal scheme rises to the level of a due process violation "turn[s] on the totality of the circumstances, with no single factor controlling." *Haimowitz,* 725 F.2d at 1577; *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). The defense is only available in the "rarest and most outrageous circumstances." *Tobias, supra,* 662 F.2d at 387.

Wilcox argues that the police interrogation of Wrentz, Marshall and Goodman "shocks the universal sense of justice" and

---

listened to several tapes from the police interrogations of the witnesses.

**11.** We will conduct a plenary review of the district court's determination of police misconduct, but give the state court findings of fact on the issue a presumption of correctness. *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88

L.Ed.2d 405 (1985). The district court's decision as to the proper remedy for the misconduct is subject to plenary review. *Id.*

**12.** *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Jackson v. Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908 (1964).

therefore violates *his* due process rights under the principles articulated in *Russell*.[13] After reviewing the reported cases applying *Russell*, however, we find that this case is clearly distinguishable from *Russell* and its progeny on the facts. The term "government misconduct" is actually an overbroad misnomer: the "government misconduct" at issue in the *Russell* line of cases has been confined to alleged government over-involvement in the planning and/or execution of a crime in a sting or reverse sting operation, rather than to a more general concept of government misconduct. *See, e.g., Russell, supra,* 411 U.S. at 423, 93 S.Ct. at 1637; *Owen, supra,* at 1521; *Haimowitz, supra,* 725 F.2d at 1577; *Tobias, supra,* 662 F.2d at 386; *United States v. Sayers,* 698 F.2d 1128, 1130 (11th Cir.1983); *United States v. Gianni,* 678 F.2d 956, 959–60 (11th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). The allegation of misconduct in this case, improper interrogation of witnesses, is not a claim that the police were over-involved in the planning or execution of the crime. This Circuit has not yet passed upon whether *Russell* may be read more broadly to apply outside of the narrow context of government over-involvement in a sting operation.

While we do not hold that *Russell* can never apply to a situation other than one alleging police over involvement in a sting operation, we do hold that it does not apply to the facts of this case. The police misconduct here, while not commendable,[14] is not so extreme that it violates a sense of "fundamental fairness, shocking to the universal justice" as far as Wilcox's constitutional rights are concerned. Nor do we find that this case presents "the rarest and most egregious circumstances" which might justify finding that Wilcox's due process rights were violated under *Russell.* Our review of the tapes and transcripts does not indicate any evidence of physical abuse or threats or improper inducements or promises in exchange for a statement implicating the defendant. We reverse the district court's finding that the police misconduct in this case violated Wilcox's due process rights.

### Admission of Coerced Testimony

■ Wilcox on cross-appeal argues that the admission of the "unreliable" and "inflammatory" direct testimony of Wrentz and prior statement of Marshall for impeachment purposes rendered his trial fundamentally unfair.[15] The district court dismissed this claim as meritless. We agree with the district court.

It is well settled that the admission of evidence which renders a trial fundamentally unfair warrants a new trial. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Even more to the point, the courts have held that the admission at trial of improperly obtained statements which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial. *See United States v. Merkt,* 764 F.2d 266, 274 (5th Cir.1985); *United States v. Chiavola,* 744 F.2d 1271, 1273–74 (7th Cir.1984); *United States ex rel Cunningham v. DeRobertis,* 719 F.2d 892, 895–96 (7th Cir.1983); *United States v. Fredericks,* 586 F.2d 470, 480 (5th

---

**13.** We note that Wilcox could not assert that the police interrogation tactics utilized against Wrentz, Marshall and Goodman violated the constitutional rights of the three witnesses because he would not have standing to raise their constitutional claims. *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–34, 31 L.Ed.2d 349 (1972); *United States v. Fredericks,* 586 F.2d 470, 480 (5th Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Scallion,* 533 F.2d 903, 916 (5th Cir.), *cert. denied,* 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1976). Instead, Wilcox claims that the police treatment of the three witnesses violates *his* personal due process rights, thereby obviating any standing problem.

See *United States v. Merkt,* 764 F.2d 266, 274 (5th Cir.1985); *Fredericks, supra,* 586 F.2d at 480.

**14.** In addressing this issue on direct review, the Supreme Court of Georgia held that, while it did not condone the police interrogations of the three witnesses, it perceived no basis for overturning the conviction. *Wilcox v. State,* 250 Ga. 745, 301 S.E.2d 251, 259–60 (1983).

**15.** We will apply a plenary standard of review on this issue. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *LaFrance v. Bohlinger,* 499 F.2d 29, 34–35 (1st Cir.), *cert. denied,* 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974).

Viewing the circumstances of the trial as a whole, it is apparent that the admission of Wrentz's direct testimony and Marshall's prior statement was not improper and did not result in a fundamentally unfair trial. The Georgia Supreme Court found that the evidence was properly admissible as a matter of state evidentiary law,[16] and while that is not dispositive of the federal constitutional question, the opportunity for cross-examination, admission of contradictory evidence, and the jury charges rendered by the trial court gave the jury adequate opportunity to assess the proper weight to be accorded to the challenged evidence. *See United States ex rel. Portelli v. LaVallee,* 469 F.2d 1239, 1240 (2d Cir.1972), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1939, 36 L.Ed.2d 412 (1973).

Even assuming that the police employed improper interrogation techniques to obtain Marshall's and Wrentz's out-of-court statements implicating Wilcox in the crime, only Marshall's out-of-court statement was actually introduced at trial. As the court's charge to the jury clearly informed them, Marshall's out-of-court statement was only introduced on cross-examination for the limited purpose of impeachment. The defendant had a full opportunity to repair any damage the impeaching statement might have caused to the credibility of Marshall's direct testimony by calling the two witnesses who testified that they had been with Marshall in Albany on the date in question.

As far as Wrentz's direct testimony is concerned, Wilcox has offered no real reason why the testimony was improperly admitted, beyond the claim that it is unreliable and inflammatory. While his testimony was to some degree confused and contradictory, it was highly relevant. There is no proof that Wrentz was incompetent to testi-

fy or that his in-court testimony was coerced. *Cf. Bradford v. Johnson,* 354 F.Supp. 1331, 1336–37 (E.D.Mich.1972), *aff'd per curiam,* 476 F.2d 66 (6th Cir. 1973) (admission of in-court testimony violated defendant's Fifth Amendment rights where witness was tortured by government and testified under threat of future torture). Furthermore, given that Wrentz's direct testimony was corroborated in various aspects by other evidence, it does not even appear that Wrentz's direct testimony is necessarily unreliable.

Even assuming, however, that the reliability of Wrentz's direct testimony and Marshall's out-of-court statements was somewhat suspect, the defendant had adequate tools in hand to challenge their reliability before the jury. The defense had full knowledge of the nature of Wrentz's and Marshall's interrogation, had access to the tapes and transcripts of the interrogation sessions prior to trial, and had a full opportunity to use those materials in examining both witnesses. Furthermore, in addition to a full opportunity to cross-examine both witnesses, Wilcox had adequate opportunity to put on independent evidence to discredit the challenged testimony and did in fact put on such evidence. Finally, the trial court gave the appropriate jury charges on reasonable doubt, credibility, and immunity to aid them in assessing the value of the evidence in question. Considering all of these factors, we conclude that Wilcox did receive a fundamentally fair trial in spite of any government misconduct that might have occurred.

### *Trial Court's Failure to Strike Two Jurors For Cause*

■ Wilcox also asserts on cross-appeal that the trial court erred in refusing to strike two jurors for cause after they indicated in voir dire that they had preconceived notions about the defendant's guilt.[17] Both jurors, Finland and Nutt, were essentially in the same position: one

---

**16.** *Wilcox v. State, supra,* 301 S.E.2d at 259.

**17.** We undertake plenary review of this issue, with deference to the state court findings of fact

as to the impartiality of the jurors. *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

admitted that she had an "inclination" as to the defendant's guilt and the other stated that she had "formed an opinion" as to the defendant's guilt.[18] Upon further questioning by the trial judge, however, both jurors stated that they would be able to decide the case solely on the basis of the evidence presented in court and the law as given by the judge. Both also stated that they would be able to disregard their previous inclinations and knew of no reason why they could not be fair and impartial jurors. The trial court then refused to strike either juror for cause. We hold that the district court did not err in dismissing Wilcox's challenge to the trial court's refusal as meritless.

■■■■ In *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), the Supreme Court held that the question of whether a particular juror has opinions which disqualify him is a question of historical fact to be resolved by the state courts. The trial court's resolution of this question of fact is entitled to special deference. *Id.* at 1038, 104 S.Ct. at 2892. The question of fact should be resolved, the Court said, by asking whether the juror swore he could set aside any opinion he might hold and decide the case solely on the evidence, and whether the juror's protestation of impartiality was believable. *Id.* at 1036, 104 S.Ct. at 2891. The question for this court is "whether there is fair support in the record for the state court's conclusion that the jurors here would be impartial." *Id.* at 1038, 104 S.Ct. at 2892.

In this case, the Georgia Supreme Court considered appellee's claim and concluded that it was meritless. The court stated that, in light of the jurors' repeated statements that they felt able to decide the case solely on the evidence presented in court, "we cannot conclude from the record that [their] opinion[s] ... [were] so fixed that [they] would not follow the instructions of the trial court." *Wilcox v. State, supra,* 301 S.E.2d at 261. After a review of the record, we find that the voir dire of both jurors provides "fair support" for the state court's conclusion that the jurors were impartial, and therefore defer to that conclusion.

### Limitation of Questioning During Voir Dire

Wilcox's final argument on cross-appeal is his claim that the trial court denied his Sixth and Fourteenth Amendment rights by refusing to allow him to ask two potential jury members whether their preconceived leanings were towards innocence or guilt. Both jurors, Swank and Parrish, admitted during voir dire that they had a leaning in one direction or another. Immediately after making those statements, however, they both said that they would be able to disregard the leaning and decide the case solely on the evidence. The trial judge then refused to let the defendant ask them which way they were leaning. Appellee now claims that the trial judge's refusal to let him ask that question violated his constitutional rights.[19] The district court also dismissed this claim as meritless.

■■■■ We agree with the district court. Under both federal and state law, a trial judge is accorded wide discretion in ascertaining what questions can and cannot be asked on voir dire. *See Rosales-Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); *Waters v. State,* 248 Ga. 355, 283 S.E.2d 238 (1981), *cert. denied,* 463 U.S. 1213, 103 S.Ct. 36, 77 L.Ed.2d 1455 (1983). The purpose of a voir dire is to ascertain whether a potential juror can render a verdict solely on the basis of the evidence presented and the charge of the trial court. *See Coleman v. Zant,* 708 F.2d 541, 547 (11th Cir.1983). The trial court's voir dire of both jurors achieved this purpose in a satisfactory manner. Both jurors stated that they could disregard their preconceived leanings, regardless of the direction, and render a verdict on the evidence presented at trial. There was no error here.

---

18. Wilcox eventually struck both jurors with peremptory challenges, so neither ended up sitting on the jury.

19. As with jurors Finland and Nutt, both of these jurors were struck with peremptory challenges and thus did not in fact sit on the jury.

*Bail*

Appellant Ford also appeals the district court's order releasing Wilcox on bail.[20] The district judge ordered Wilcox released on bail after a finding that Wilcox had a likelihood of success on appeal. Appellant Ford argues that there must be a showing of exceptional circumstances before a petitioner in Wilcox's position can be released on bail pending appeal. Since no demonstration of exceptional circumstances was made here, he argues that the district court's decision to release Wilcox on bail was error.

It is well established that a federal district court has the power to enter an order affecting the custody of a habeas petitioner who is properly before the court contesting the legality of his incarceration. *In re Wainwright,* 518 F.2d 173, 174 (5th Cir. 1975); *Calley v. Callaway,* 496 F.2d 701, 702 (5th Cir.1974); *Mitchell v. Bell,* 458 F.Supp. 1044, 1049 (M.D.Ala.1978). At a minimum, it is clear that a habeas petitioner who has had a full trial and appeal stands in a very different position from a defendant who has not had a prior determination of his rights. *See Ostrer v. United States,* 584 F.2d 594, 599 (2d Cir.1978); *Glynn v. Donnelly,* 470 F.2d 95, 97 (1st Cir.1972). Not only has the petitioner lost the presumption of innocence, but the state has a greater interest in maintaining custody of the petitioner. *Glynn, supra,* 470 F.2d at 98.

We need not reach the question of whether a finding of exceptional circumstances is required because our discussion of the merits should make it plain that the district court's finding of likelihood of success on appeal was in error. We reverse the district court's determination to release the petitioner on bail.

The district court's orders of December 20, 1985, granting the writ of habeas corpus and December 30, 1985, granting the appellee's motion for bail are reversed and vacated.

This case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.

APPENDIX

(Partial Summary of the Facts. Additional Facts will be set forth in the court's discussion of the issues.)

On August 31, 1972, a Thursday, thirty-five year old Hellen Hanks disappeared. At the time of her disappearance, Hanks was working as a bookkeeper and secretary for Wilcox Outdoor Advertising Company in Valdosta, Georgia. Appellee E.K. Wilcox, Jr., and his father, E.K. Wilcox, Sr., own Wilcox Advertising Company.

Witnesses at trial testified that Hellen went to work the morning of the 31st in her usual manner. She was wearing a green dress with a long strand of green beads. After work she planned to have her hairpiece combed and her typewriter repaired. She was last seen at about 8:15 a.m. in the Wilcox Outdoor Advertising offices.

At about 5:00 p.m. that afternoon, Hellen's husband, James Hanks, received a phone call from E.K. Wilcox, Jr. Wilcox told Hanks that he could not find Hellen around the office, although her car was still there. Hanks immediately drove to the Wilcox offices, arriving there at around 5:20 or 5:25 p.m. Wilcox also called the Valdosta police and the Georgia Bureau of Investigation (GBI). They arrived at the Wilcox business at approximately 5:30 p.m. and began searching the Wilcox Advertising office and warehouse. They did not find Hellen, but they did find her typewriter and hairpiece in the car and two completed applications for employment in her purse.

The Valdosta police and GBI both continued their investigations of Hellen's disappearance for several days. Both investigations were eventually discontinued for lack of evidence.

---

**20.** The standard of review here is whether the district court abused its discretion in granting bail. *United States v. Hurtado,* 779 F.2d 1467 (11th Cir.1985).

On November 24, 1980, over eight years after Hellen Hanks disappeared, a logger plowing up a wooded area outside of Valdosta uncovered a wooden box. The plow ripped off the top of the box, exposing a skeleton. The logger immediately called the police. As the police arrived and began to search the box and the area immediately around it, they uncovered the following items: a metal cash box, a second metal box, a bank bag, receipt books, a padlock with a key inserted, several other keys, portions of a dress, a wedding ring, a string of beads, lingerie, shoes, a mass of hair, and a length of rope. While the shoes were found inside the box, the other articles of clothing were found underneath the box. Some of the papers found with the box referred to the Wilcox Outdoor Advertising Company.

The burial box, the remains, and the other items found at the burial site were collected and examined by forensic experts. Dr. Robert Johnson, a dentist, compared the skull to Hellen's dental records and established that the skull belonged to Hellen.

In addition, many of the personal belongings found at the burial site, such as the dress, the wedding ring, and the beads, were identified as belonging to Hellen. Both the dress and the bra showed signs of being torn or cut.

Dr. Larry Howard of the Georgia State Crime Lab conducted two examinations of the skeletal remains. He concluded the first examination around March 10, 1981, shortly after the box was found. He testified that he was not able to establish the cause of death, but that he was nevertheless of the opinion that she was strangled. He based his opinion on knowledge of the conditions of the burial site and on other items found in and around the burial box, particularly the rope. The rope was found tangled in the hair and lying in the chest or neck area of the skeleton. He further testified that the rope had the approximate diameter of a neck when allowed to assume its own shape.

Dr. James Howard of the State Crime Laboratory testified that hairs, consistent with hairs taken from the mass of hair found in the box, were imbedded in the surface of the rope. He testified that such a condition would not exist from casual contact. He further testified that the combination of the condition of the rope, the condition of the hair, and the hair's adherence to the rope were consistent with the hair being imbedded in the rope while the victim was still alive. He also testified that the curl or loop in the rope indicated that it had been crossed or tied and left that way for a long period of time.

Dr. Larry Howard's second examination of the remains occurred in August 1981.[21] Dr. Howard testified that his second examination revealed certain abrasions and staining in the area of the left knee cap which indicated that the left leg had been dismembered below the knee prior to the first burial. Dr. Ellis Kerley, a forensic pathologist from the University of Maryland, also examined the remains. He testified that, while he could not be positive of dismemberment, the abrasions on the bones were consistent with dismemberment shortly after death.

Dr. Joseph Burton offered a contrary opinion. He testified that the state of oxidation or mineralization of the abrasions indicated that the marks were a recent injury to the bones. He also testified that he did not think the abrasions were consistent with dismemberment of the leg.

Several witnesses testified that the burial box was similar to boxes used by Wilcox Advertising to carry equipment ont he back of trucks. Wilcox, Jr., told several police officers that the burial box looked like a box that had been reported missing from the business in 1972. Willard King, who worked for the Wilcox business part-time on Saturdays in 1972, testified that he found one of these boxes missing the second Saturday after Hellen's disappearance.

21. The second examination of the remains took place after the interrogation of two Wilcox Advertising Company employees, Lorenzo Marshall and Ed Wrentz, discussed *infra,* revealed the possibility that the body may have been partially dismembered.

He had not worked the Saturday immediately following her disappearance.

Other items found at the burial site were also connected to the Wilcox business. One of the keys found in the box was an ignition key to Wilcox, Jr.'s pick-up truck which was kept by Hellen while she was the business's secretary. The cashbox and the rusted padlock with the key were both linked to the Wilcox business.

The police began an investigation into the murder of Hellen Hanks. The most significant evidence turned up in the course of the investigation were statements taken during the interrogations of two long-time employees of Wilcox Outdoor Advertising Company, Lorenzo Marshall and Ed Wrentz. These statements are also of central significance in this appeal.

Ed Wrentz, an elderly black man who had worked for the Wilcox business for more than thirty years, gave a signed statement on July 1, 1981, which implicated Wilcox, Jr., in Hellen's death. Wrentz was seventy-eight at the time of trial and could not read or write. The statement said that he and Lorenzo Marshall had helped Wilcox, Jr., and Wilcox, Sr., load Hellen Hanks' stiffened corpse into a box at the Wilcox warehouse and that they had dug a hole the night of Hellen's disappearance and buried her.

At trial on direct examination Wrentz gave testimony basically consistent with his July 1, 1980, statement. He testified that Wilcox, Jr., had driven him and Lorenzo Marshall into the country to dig a hole, but that they did not finish because it began to rain. He did not remember the date or time, but testified that it was dark, although it had not been dark long. He also testified that at some later date, he and Lorenzo Marshall met Wilcox, Jr., and his father at the Wilcox business warehouse, placed Hellen Hanks' body into a box, and loaded the box onto a truck. He further testified that the body was stiff and that extra pieces, which he thought might be part of her legs, were also put into the box. He said that they drove to the hole and finished digging it, and then placed the box along with a few other items into the hole.

On cross-examination Wrentz contradicted the testimony he had given on direct examination. He stated that he had told the police the first time he talked to them that he did not know anything about Hellen Hanks' disappearance and that he had been out of town from Thursday, August 31, through Saturday, September 2. He also testified, however, that he did get a box from the warehouse and that he did dig a hole. On redirect, Wrentz repeated the testimony he gave on direct examination. He stated that he and Lorenzo had placed Hellen Hanks' body in a medium-sized box, driven somewhere in a pick-up truck, dug a hole, and buried the box.

Other witnesses at trial corroborated some of Wrentz's direct and re-direct testimony on various details pertaining to the disposal of the victim's body. Drs. Howard and Kerley gave testimony supporting Wrentz's observation that the victim's legs had been dismembered, and other witnesses corroborated Wrentz's description of the burial site. In addition, there was evidence introduced to establish that it was indeed raining in Lowndes County on the night of Hellen Hanks' disappearance.

Lorenzo Marshall, another elderly black Wilcox Advertising employee with a limited education, also gave a signed statement to the police basically corroborating Wrentz's statement and direct testimony at trial. At trial, however, he recanted his statement. He testified that he was in Albany, Georgia, from Tuesday, August 20, through Friday, September 1, in 1972 and that he had nothing to do with the burial. Two other employees of Wilcox advertising testified that they had been in Albany working with Marshall the week of Hanks' disappearance. Marshall's prior statement was brought in to impeach his testimony. He explained that he had tried to tell the officers that he did not know anything about the disappearance, but that the officers put words in his mouth by telling him what Ed Wrentz had said. He testified that he only went along with the story because he was scared and wanted to go home.

E.K. Wilcox, Jr., testified that he and his father left Atlanta on the morning of Au-

gust 31 to return to Valdosta. He testified that he and Wilcox, Sr., had stopped in Cordele, Georgia, to visit his father-in-law, Willard King. They stayed approximately an hour. He further testified that upon arriving in Valdosta they both went home to get their own cars and then drove separately to the office. He testified that they arrived at the office at around 4:14 to 4:30 p.m.

Wilcox further testified that they discovered that Hellen was missing as soon as they arrived. They looked for her but were unable to find her. He then called Hellen's husband at about 4:45 to inquire about her whereabouts and called the police shortly thereafter. Wilcox, Sr., testified to the same essential facts concerning the time of their arrival and the circumstances following it.

Wilcox, Jr., testified that he did not go home until approximately 8:00 p.m., when the police search ended. He then drove home and washed up and met his wife at a party honoring him and his wife. He arrived at the party between 8:30 and 9:00 p.m. He also testified that after the party was over he went back to the office to make sure the doors were locked and arrived home at 11:15.

The Wilcoxes' testimony was contradicted on some points at trial. Two police officers testified that the search ended at around 6:30 p.m. There was also some testimony that Wilcox, Sr.'s car was not parked outside the office during the search, although Wilcox, Sr., had testified that he had driven it into work. Wilcox, Jr.'s ex-wife contradicted his testimony as to their time of arrival at the office. She testified that he had called her at around 5:00 to tell her that Hellen Hanks was missing. During the course of the conversation he told her that he and his father had arrived at the office at around 3:00 or 3:30. Wilcox's father-in-law also contradicted the Wilcoxes' testimony as to their time of departure from Cordele. He stated that the Wilcox father and son had left his home at approximately 1:30. Wilcox's wife testified that the drive from Cordele to Valdosta took 60–70 minutes, while his father-in-law testified that the drive took an hour and a half.

Wilcox's ex-wife testified that Wilcox, Jr., and Wilcox, Sr., did not arrive at the party until 9:00 p.m. She also testified that after the party ended at 10:30, Wilcox did not return home with her but instead told her he needed to go back by the business to make sure that everything was locked up. She further testified that he had not returned home by the time she went to sleep at 11:00, but that he was there when she awoke the next morning.

Several witnesses testified to strained relations between Wilcox, Jr., and Hellen Hanks. Several of Hellen's friends testified that she had confided in them shortly before her disappearance that she was afraid of the younger Wilcox and that he had made sexual advances towards her. She also told a few friends that she was so afraid of Wilcox that she was looking for another job. One employee of Wilcox Advertising testified that he saw Wilcox place his hands on Hellen's buttocks and saw her push him away, while another employee testified that he saw the two bump into each other in a doorway and "appear disturbed".

Wilcox denied that he had ever touched or patted Hellen. He also testified that, although he had been irritated with her on one occasion, she was a good employee with whom he never had any difficulty.