[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 21, 2004
THOMAS K. KAHN
CLERK

_____

No. 02-15674

_____

D. C. Docket No. 95-00914-CV-A-JEC


ROBERT DALE CONKLIN,

Petitioner-Appellant,

versus

DERRICK SCHOFIELD,

Respondent-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 21, 2004)

Before EDMONDSON, Chief Judge, BARKETT and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Robert Dale Conklin, an indigent defendant, appeals the denial of his 28

U.S.C. § 2254 petition for a writ of habeas corpus in his capital case. After review

of the record and oral argument, we affirm.

BACKGROUND

Conklin, a twenty-three year old McDonalds manager, first met George Crooks, a twenty-eight year old lawyer, at an interstate rest stop. Over a period of time, the two established an intimate sexual relationship. On the night of Monday, March 26, 1984, Crooks went to Conklin's apartment. According to Conklin, he told Crooks that evening that he wished to end their relationship, at which point Crooks became "moody" and "upset." Later in the evening, the two men smoked marijuana, and Crooks, who had recently had his wisdom teeth removed, also took several codeine pills.

Conklin claims that when he attempted to go to bed that evening, Crooks would not allow him to sleep. In Conklin's statement given to law enforcement officers after his arrest ("post-arrest statement"),[1] Conklin explains, "[Crooks] kept messing with me and it turned into a wrestling match. I got tired of it, told him to quit and he wouldn't. This went on for quite a while, an hour to an hour and a half. [E]ventually he had me pinned on the bed sitting on my stomach. I was wrestling trying to get free. I was mad but he thought it was all a big joke."

Although not mentioned in his post-arrest statement, Conklin testified at

_____

[1] For a complete recitation of Conklin's post-arrest statement, see *Conklin v. State*, 331 S.E.2d 532, 535-37 (Ga. 1985).

2

trial that the events escalated when Crooks told Conklin that he wanted to have anal intercourse with him against Conklin's wishes. At this point, Conklin allegedly attempted to force Crooks to leave. His post-arrest statement continues, "[e]ventually I . . . hit him and he hit me back. He was still sitting on me. We were there struggling and I reached over and grabbed a screwdriver. I swung the screwdriver and it stuck into him. He rolled off the bed and I followed him screwdriver in hand." At trial, Conklin altered this previous statement, testifying, "[Crooks] rolled off the bed and I followed him and stopped at the edge of the bed and I had the screwdriver in my hand." He then testified, "he saw that I had the screwdriver, he told me to give it to him. He . . . got hold of me around the waist, or legs. He pulled me off the bed and we started to struggle for the screwdriver . . . and he was going to take it away from me." Conklin testified that he became afraid for his own life at this point. He admitted at trial, however, that he initially did not think Crooks was trying to hurt him.

Conklin's post-arrest statement continues, "I held him down and I stuck the screwdriver in his ear, I wiggled it around . . . . I tried to stop him from bleeding but I think he was already dead." At trial, Conklin added testimony of a greater struggle occurring immediately after this second stabbing. He testified, "[Crooks] squirmed away. He got away, and he grabbed me, he was saying 'give me the

3

screwdriver.' We were struggling and I stabbed him other times during the struggle. I don't know how many times or where . . . . I was just fighting the best I could." On cross-examination, Conklin stated that he may have stabbed Crooks up to seventeen times with the screwdriver, and that some of these stabbings may have been inflicted in the neck and shoulder area.

Conklin, who had been released on parole after serving a period of incarceration in Illinois, decided not to call the police. According to Conklin, rather than calling the police, he "panicked" and decided to dispose of the body. Because the body was too heavy for Conklin to transport by himself, Conklin dragged Crooks's body to the bathtub and attempted to lighten it by draining it of blood.

Leaving Crooks's body in the bathtub, Conklin went to Crooks's apartment to destroy any evidence connecting the two men. He replaced the cassette tape in Crooks's answering machine, and took a card containing Conklin's name and telephone number. Conklin then took Crooks's checkbook and drove Crooks's car to a grocery store, where he purchased cleaning supplies and knives. Conklin abandoned Crooks's car in a parking lot and returned to his apartment.

Conklin's post-arrest statement describes his attempt to dispose of Crooks's body, stating, "[w]hen I got [to the apartment] I went ahead and went to work to

4

cut him in half so I could get him out of there. . . . I decided there would be less of him to move if I could put some of him down the garbage disposal. . . . I then cut the rest of him up in small enough pieces to put in the bags."

During the next twenty-four hours, Conklin tried to maintain normalcy. Conklin went to a meeting at work from 3:00 p.m. to 5:00 p.m., and had friends over that evening while Crooks's body was still in his bathroom. That night, Conklin placed Crooks's body in several trash bags and disposed of them in the dumpster outside of his apartment. He got up for work the next day, but took a bus to Florida when he discovered that the police had found Crooks's body. Conklin returned to Georgia a few days later and was caught by the police.

The police recovered a great deal of evidence from the trash dumpster where Crooks's body was found, including several knives, five screwdrivers, a length of rope, bloody bed clothes, and credit cards belonging to Crooks. Crooks's body itself was dispersed in nine separate garbage bags.

In addition to the items found in the dumpster, the police recovered substantial evidence linking Conklin to the murder. Upon searching Conklin's apartment, the police recovered carpet fibers that matched fibers from bed clothing that had been found in the dumpster. The police also found blood spots on Conklin's bed, observed blood on the carpet beside the bed, recovered body parts

from the garbage disposal, and found a forged birth certificate in the name of "Robert Allan King." Conklin later admitted that, before he was caught by the police, he planned to obtain a social security card and a driver's license in that name.

In Conklin's post-arrest statement, he states that only two screwdriver wounds were inflicted prior to death. This statement was contradicted at trial by several pieces of evidence. For instance, Conklin altered his own post-arrest statement by testifying at trial that he stabbed Crooks several additional times with the *screwdriver* while they struggled for its possession. In response, the state presented evidence that these additional wounds were inflicted before death by a *knife* rather than a screwdriver, thereby further undermining Conklin's story.

In addition, several witnesses testified that Conklin was not visibly bruised or injured on the day following Crooks's death, tending to undermine Conklin's self-defense claims.[2] Moreover, the police recovered a book, *Foxfire*, from Conklin's bedroom which sets forth procedures for slaughtering animals and specifically describes how to drain animals of blood. At trial, Conklin admitted to having read this book and treating Crooks's body in a similar manner.

---

[2] A McDonalds co-worker, who stopped by Conklin's apartment on the night after the murder, testified that he saw no bruises on Conklin's face, head, or chest, and that Conklin was his "normal self" that evening.

Finally, the autopsy report prepared by the state's medical examiner, Dr. Saleh Zaki, and his subsequent trial testimony supported the prosecution's version of events. On direct examination, Dr. Zaki testified that eight stab wounds on the right side of the victim's neck were "antemortem," meaning that, in his opinion, these wounds were inflicted prior to death.[3] Dr. Zaki also found two additional antemortem stab wounds in the lower right side of the neck, as well as evidence that Crooks's head was hit by a blunt object prior to death. The death certificate prepared by Dr. Zaki, which was admitted into evidence, concluded that the "immediate cause" of death was "stab wounds to neck and chest" with "other significant conditions" being "head and neck trauma."

Notably, however, in *voir dire* of Dr. Zaki outside the presence of the jury but within the presence of the trial judge, Dr. Zaki admitted that, while it was his opinion that the eight knife wounds to the neck were inflicted prior to death (which conflicted with Conklin's defense and testimony), it was also possible that these wounds were inflicted shortly after death (which did not conflict with Conklin's defense and testimony). Conklin's attorney, Tommy Chason,

---

[3] In the state's direct examination of Dr. Zaki, the state asked, "were you able to determine whether those [eight] stab wounds [to the neck] were made before or after death?" Dr. Zaki responded, "[t]hese are antemortem stab wounds." The state then sought further clarification, asking, "[i]n your opinion, were those marks or those stab wounds made before death or after death?" Dr. Zaki responded, "Before death, antemortem."

7

subsequently obtained Dr. Zaki's admission on cross-examination that antemortem wounds could occur "a very short period of time after death," thereby undermining Dr. Zaki's statement on direct examination that the eight knife wounds to the neck occurred before death.

In an effort to further rebut the testimony of Dr. Zaki and to prove that he did not intentionally kill George Crooks, Conklin filed two pre-trial motions requesting funds to hire an independent medical expert. Conklin's counsel explained to the court that he needed a medical examiner not only to assist in presenting Conklin's defense but also to facilitate his cross-examination of Dr. Zaki. At this time, the court was aware that Conklin's sole defense of disproving intent depended on his ability to pinpoint the exact cause of death. The more specific of Conklin's two pre-trial motions requested funds not to exceed $2,500, and sought "expert assistance of psychiatric, medical and other forensic aids . . . ." In addition to these two motions, Conklin made several oral requests for funds to hire independent medical experts. However, the court denied each of Conklin's requests. Prior to sentencing, Conklin renewed his motion seeking expert assistance, but the court again denied this request.

Conklin was convicted for the murder[4] of George Crooks in the Superior

Court of Fulton County, Georgia on June 16, 1984. At the sentencing phase, the

jury found as a statutory aggravating circumstance that the murder was

outrageously or wantonly vile, horrible, or inhumane and that it involved depravity

of mind. Having satisfied the requirements of O.C.G.A. § 17-10-30(b)(7),[5] the

jury recommended that Conklin be sentenced to death. The trial judge agreed.

Conklin appealed his conviction and death sentence to the Supreme Court of

Georgia, which upheld the sentence. *See Conklin v. State*, 331 S.E.2d 532 (Ga.

1985). The United States Supreme Court denied Conklin's petition for writ of

certiorari on December 16, 1985. On February 24, 1986, the Court denied

Conklin's request for rehearing. *See Conklin v. Georgia*, 474 U.S. 1038 (1985),

*reh'g denied*, 475 U.S. 1040 (1986). Conklin then filed a state habeas corpus

---

[4] Under Georgia law, "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. § 16-5-1(a) (1981). In order to satisfy the intent element of O.C.G.A. § 16-5-1(a), malice need only exist for a very short period of time prior to a killing. *See Brown v. State*, 8 S.E.2d 652, 654 (Ga. 1940).

[5] In Georgia, the death penalty can be imposed only if the jury finds the existence of at least one of ten statutorily enumerated aggravating circumstances. *See O.C.G.A. §17-10-30(b)(1-10).* The section 17-10-30(b)(7) circumstance found here "consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated battery to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant. . . . [T]he evidence must be sufficient to satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component." *See Conklin v. State*, 331 S.E.2d 532, 539 (Ga. 1989).

petition on April 7, 1986.  Evidentiary hearings were conducted in the state court on May 24, 1989, and September 24, 1990.  The state court denied habeas relief on October 1, 1992.  The United States Supreme Court denied Conklin's petition for writ of certiorari on May 16, 1994.  *Conklin v. Zant*, 511 U.S. 1100 (1994), *reh'g denied*, 512 U.S. 1248 (1994).

Conklin sought federal habeas corpus relief on June 22, 1995.  On October 14, 1999, the district court denied federal habeas relief on most of Conklin's claims.  On August 28, 2001, the district court denied relief on his remaining claims.  After denying Conklin's motion for a new trial, the district court granted a certificate of appealability ("COA") as to "all issues" in its second order denying habeas relief.  We granted an expansion of the COA on February 19, 2003.

ISSUES ON APPEAL

Conklin asserts the following grounds for habeas relief:

(1)  The evidence was insufficient to support the jury's verdict because no rational factfinder could have found beyond a reasonable doubt that the killing was not in self-defense;

10

(2)     The trial court conducted Conklin's trial in such a manner that no competent

counsel could have rendered effective assistance, and therefore prejudice

should be presumed pursuant to *United States v. Cronic*, 466 U.S. 648

(1984);

(3)     Because of defense counsel's inability to ask appropriate questions

regarding the victim's reputation, Conklin was denied effective assistance

of counsel which rendered the result of the proceedings unreliable. *See*

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

(4)     The trial court's refusal to appoint a defense pathologist violated

petitioner's right to due process of law pursuant to *Ake v. Oklahoma*, 470

U.S. 68 (1985);

(5)     All of the above errors taken together robbed petitioner of a fair and reliable

trial and sentencing proceedings in violation of *United States v. Blasco*, 702

F.2d 1315 (11th Cir. 1983).[6]

---

[6] The district court granted a COA on two additional issues: (1) whether the trial court's failure to provide Conklin with an independent psychiatrist or psychologist violated *Ake v. Oklahoma*; and (2) whether defense counsel was ineffective for failing to obtain the appointment

## STANDARD OF REVIEW

We review de novo a district court's denial of a habeas corpus petition under 28 U.S.C. § 2254. *See Sims v. Singletary*, 155 F.3d 1297, 1304 (11th Cir. 1998). Because Conklin filed his petition prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we review de novo the district court's resolution of questions of law and of mixed questions of law and fact. *Mincey v. Head*, 206 F.3d 1106, 1130-31 (11th Cir. 2000). When the state habeas court has held an evidentiary hearing, as in this case, the findings of fact by the state court are generally presumed to be correct unless clearly erroneous. *See Thompson v. Keohane*, 516 U.S. 99, 107-09 (1995); *Mincey*, 206 F.3d at 1131.[7]

## I.    INSUFFICIENT EVIDENCE TO SUPPORT VERDICT

---

of an independent psychiatrist or psychologist. We will not consider these issues because Conklin has not argued the merits of these claims on appeal. *See Farrow v. West*, 320 F.3d 1235, 1242 n.10 (11th Cir. 2003).

[7] The district court adopted the state habeas court's findings of fact with respect to the issues herein.

Conklin first argues that the evidence was insufficient to find him guilty of capital murder because no rational factfinder could have found beyond a reasonable doubt that he acted with malice.

In reviewing allegations of sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Faced with a record of historical facts that supports conflicting inferences, we must presume that the jury resolved such conflicts in favor of the prosecution, and we defer to the jury's judgment as to the weight and credibility of the evidence. *See Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir. 1987). The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief. *Id.*

Under Georgia law, "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. § 16-5-1(a) (1981). Express malice is defined as the "deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." *Id.* at § 16-5-1(b). Implied malice exists "where no considerable provocation appears and

13

where all the circumstances of the killing show an abandoned and malignant heart." *Id.*

Conklin argues that the evidence is insufficient to support a finding of malice aforethought because the evidence only shows that he killed Crooks in self-defense. However, viewing the evidence in the light most favorable to the prosecution, we find that the jury could have found the presence of malice beyond a reasonable doubt.

Substantial evidence points to the presence of malice. First, Dr. Zaki's testimony that the multiple knife wounds to the victim's neck were, in his opinion, inflicted prior to death, implies a premeditated and brutal killing. Dr. Zaki's opinion was bolstered by the fact that he had been a medical examiner for eleven years and had performed over 3,500 autopsies.

Second, Conklin's treatment of Crooks's body after his death supports the finding of an "abandoned and malignant heart" necessary to find implied malice. *See* O.C.G.A. § 16-5-1(b) (1981).

Third, by convicting Conklin of murder and recommending a sentence of death, the jury necessarily discredited Conklin's testimony that he killed Crooks in self-defense. The jury was entitled to discredit Conklin's testimony. *See United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999) (noting that a court of

14

appeals must accept the jury's credibility determinations where the testimony of a witness is not incredible as a matter of law); *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990) ("[c]redibility determinations are the exclusive province of the jury"); *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983) ("[a] jury is free to choose among reasonable constructions of the evidence") (citation omitted).

The jury's decision not to believe Conklin's version of the events is supported by several facts. First, Conklin's post-arrest statement and trial testimony were inconsistent as to critical details just prior to Crooks's death. Second, Conklin was not visibly bruised or injured on the day following Crooks's killing, tending to undermine Conklin's self-defense claims. Finally, rather than calling the police immediately, Conklin dismembered Crooks's body, attempted to cover up his crime in various ways, and fled to Florida. This is evidence that a reasonable jury could have relied upon to find Conklin guilty of malice murder.

## II. PER SE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Conklin argues that his trial was conducted in such a manner that no competent counsel could have rendered effective assistance, thereby creating a

valid claim for *per se* ineffectiveness. To support this claim, Conklin relies on two grounds – the court's denial of funds for an independent pathologist and the court's alleged rush to trial. We find this claim to be without merit.

Whether a criminal defendant has received effective assistance of counsel is a mixed question of fact and law. *See Mincey*, 206 F.3d at 1142. We review for clear error the district court's findings of historical facts underlying the claim, and we review de novo the court's decision on the ultimate issue – whether counsel's performance passed constitutional muster. *See id.*

The United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

Generally, to establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and counsel's performance prejudiced the defense. *See Mincey*, 206 F.3d at 1142 (citing *Strickland*, 466 U.S. at 687). However, prejudice need not be shown in certain limited situations. *See United States v. Cronic*, 466 U.S. 648, 659-60 (1984). *Cronic* notes four situations where courts have found *per se* ineffectiveness: (1) where there has

16

been a "complete denial of counsel;" (2) where the accused is denied the presence of counsel at "a critical stage" such as arraignment; (3) "[when] counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (4) where circumstances are so prejudiced against the defendant that competent counsel could not render effective assistance.[8] *See Cronic*, 466 U.S. at 659-61.

We consider Conklin's two grounds for *per se* ineffectiveness separately. First, Conklin claims that by rushing his trial, the court denied him the effective assistance of counsel. This claim is without merit.

Conklin was indicted on April 25, 1984, and lead counsel Tommy Chason was appointed on May 4, 1984. Trial began thirty-seven days later, despite Chason's requests for additional time to prepare.[9] The fact that Chason had just thirty-seven days to prepare for trial does not lead to *per se* ineffectiveness. In *Cronic*, the Supreme Court rejected a similar claim. *See id.* at 666. *Cronic* presented a stronger case for *per se* ineffectiveness than the instant case. In *Cronic,* defense counsel was given just twenty-five days to prepare for trial, his

---

[8] *See, e.g., Powell v. Alabama*, 287 U.S. 45, 58 (1932) (reversing rape convictions and death sentences where indigent defendants were indicted without the assistance of counsel, were not provided competent counsel until the first day of trial, and were tried in less than one day).

[9] On May 30, 1984, Chason requested additional time to prepare at a pretrial hearing, but the court denied his request. On the Friday before trial, Chason informed the court that he was unprepared for trial. The court again denied Chason's request for a continuance, and proceeded to trial the following Monday.

principal practice was real estate while the defendant was on trial for mail fraud, and this was his first jury trial. *Id.* at 665. Nevertheless, the Court held that these facts did not justify a presumption of ineffective assistance. *Id.*; *see also Avery v. Alabama*, 308 U.S. 444 (1940) (rejecting *per se* ineffective assistance claim where counsel was appointed in capital case just three days before trial). In the instant case, Conklin's attorney had previously tried at least five death penalty cases, he was given more time to prepare for trial than the attorney in *Cronic*, and he was able to present a viable defense. Although the trial judge was less than generous in affording Chason adequate time to prepare for trial in a capital murder case, we are nonetheless compelled, pursuant to *Cronic*, to reject Conklin's first ground for *per se* ineffectiveness.

Conklin's second ground for *per se* ineffectiveness rests on the trial court's denial of funds to hire an independent pathologist. Conklin argues that, as a result of the denial of funds, his "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing" at the sentencing phase. *See Cronic*, 466 U.S. at 659.

To support his claim, Conklin points to Chason's admission at the state habeas proceedings that although he could have called the defendant's girlfriend and father as mitigating witnesses, he simply "gave up" after the court denied his

18

requests for an independent medical expert. Chason testified, "if I could not present my entire mitigation and all the evidence I wanted to present, there wasn't any use of me presenting any of it."

While Chason's decision not to present potential mitigating evidence at sentencing is questionable, the Supreme Court has ruled that an attorney's failure to combat the prosecution must be "complete" in order to avoid the prejudice requirement; if the attorney presents any mitigating evidence, then actual prejudice must be shown. *See Bell v. Cone*, 535 U.S. 685, 697-98 (2002); *see also Darden v. Wainwright*, 477 U.S. 168 (1986) (applying both *Strickland* requirements even though counsel did not present any mitigating evidence at capital sentencing). In the instant case, the district court found that Conklin's counsel (1) thoroughly researched and investigated possible defenses, (2) consulted with a psychiatrist, (3) interviewed possible witnesses, (4) interviewed Conklin, (5) consulted with the medical examiner and police officers, and (6) employed an investigator to find potential witnesses.

Further, the state habeas court discredited Chason's testimony implying that he did not adequately prepare for the sentencing phase. The state court found that "Chason made a specific tactical decision not to put up any evidence at the sentencing phase . . . . His decision was based on . . . his feeling that . . . a half-

19

hearted presentation would not be helpful." The court found that Chason's statements were inflated as an effort to keep Conklin from receiving the death penalty, which Chason personally opposed. These findings are supportable by the record. The record shows that Chason had presented a great deal of mitigating evidence during the guilt phase, including testimony from Conklin's father. In addition, Chason himself stated during the state habeas proceedings that although he had several witnesses ready to testify at sentencing, "without the psychiatrist testimony, I made the election not to put up any evidence." The state court therefore did not commit clear error in finding that Chason did not present additional mitigating evidence at sentencing for tactical reasons. *See Mincey*, 206 F.3d at 1130-31. As such, we reject Conklin's *per se* ineffectiveness claims and now apply both *Strickland* requirements to Conklin's ineffective assistance claims.

III. INEFFECTIVE ASSISTANCE CLAIMS UNDER *STRICKLAND*

Conklin presents two grounds for ineffective assistance of counsel: (1) ineffectiveness at trial for the failure to elicit negative character evidence concerning the deceased; (2) ineffectiveness at sentencing for failing to put on any

mitigating evidence at sentencing.

Under *Strickland*, to establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. The standard for judging counsel's performance is "reasonableness under prevailing professional norms." *Id.* at 688. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A.   INEFFECTIVE ASSISTANCE AT GUILT STAGE

Conklin argues that Chason was ineffective for failing to elicit certain mitigating testimony at trial. After the state questioned the victim's father – who portrayed the victim as a hard-working, successful, and intelligent man – the defense called Chuck Desederio in an attempt to rebut this evidence and show that Crooks had provoked his killing. Desederio, who had shared an office with Crooks, would have testified that Crooks had "a personality disorder," would often

get hostile and lose his temper, "was easily triggered," and had a tendency for violence. The judge did not allow some of Desederio's statements because under Georgia law, general reputation evidence is admissible but evidence of specific acts of violence is not. *See Henderson v. State*, 218 S.E.2d 612, 614 (Ga. 1975). The judge instructed Chason to "ask questions about general reputation if you want to." Chason subsequently failed to follow up with questions about the victim's reputation. Conklin argues that this failure created a viable ineffective assistance of counsel claim.

We find that Chason's failure to elicit reputation evidence from Desederio was not prejudicial. Through cross-examination of the state's witnesses, Chason demonstrated that Crooks had been reprimanded for raising his voice at a secretary; that he had fantasized about Conklin; that he liked young, blond-haired males; that a police officer stated that "this looked like a jealousy situation;" and that Crooks was "a fairly explosive person" who overreacted to situations. Because Chason's failure to elicit further character evidence concerning the deceased was not prejudicial, we do not find Conklin's claim to be persuasive.[10]

### B. INEFFECTIVE ASSISTANCE AT SENTENCING

---

[10] For the same reasons, we reject Conklin's argument, based on *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002), that his attorney prejudiced his trial by arguing to the jury that it would hear evidence of the victim's violent character but then failed to present this promised evidence.

22

Conklin also argues that his attorney was constitutionally ineffective because he did not present any mitigating evidence at sentencing. We find that Chason's conduct at sentencing does not rise to the level of ineffectiveness.

Under *Strickland*, we first consider whether counsel's performance was constitutionally deficient, which "depends upon the totality of the circumstances [and is] shaped by the rules and presumptions set down in *Strickland . . .* and its progeny." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc). One of those presumptions is the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 1511-12 (citing *Strickland*, 466 U.S. at 689). Under the totality of the circumstances test, we ask "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial," rather than asking what most "good lawyers" would have done. *Id.* at 1512 (citing *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992)). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Id.*

A sentencing jury should not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. *See*

23

*Grayson v. Thompson*, 257 F.3d 1194, 1224 (11th Cir. 2001) (citations omitted).

However, counsel need not present all available mitigating circumstance evidence in order for counsel's conduct to be deemed effective at the sentencing stage. *See Waters*, 46 F.3d at 1511. Indeed, "the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient *when no mitigating circumstance evidence at all was introduced*, *even though such evidence . . . was available*." *Id.* (internal citations omitted) (emphasis added) (citing *Darden*, 477 U.S. at 184-87; *Stevens v. Zant*, 968 F.2d 1076, 1082-83 (11th Cir. 1992); *Francis v. Dugger*, 908 F.2d 696, 702-04 (11th Cir. 1990); *Stewart v. Dugger*, 877 F.2d 851, 855-56 (11th Cir. 1989)). With these principles in mind, we consider whether defense counsel's performance at sentencing was deficient.

Conklin argues that Chason's failure to provide any mitigating evidence at sentencing was constitutionally ineffective in light of the fact that Chason's sole strategy was to "humanize" Conklin in order to avoid a sentence of death.[11] Notably however, the mitigating testimony of Conklin's girlfriend and father had already been offered during the guilt stage. In addition, Chason chose to put Conklin on the stand and was able to elicit certain "humanizing" testimony

---

[11] In the state habeas proceedings, Chason stated that "humanizing" Conklin was his sole sentencing strategy. This point was also emphasized at oral arguments.

24

directly from him. *See Waters*, 46 F.3d at 1519 ("putting the defendant on the stand sometimes can help 'humanize' him in the eyes of the jury"). Indeed, in his closing argument at the guilt stage, Chason argued, "You heard [Conklin's father] testify that [the defendant] was on the right trail. That's a mitigating factor. The fact the he has rehabilitated himself . . . is a mitigating factor. [He had] his girlfriend, he had a job, he was trying to be a law abiding citizen. And what happened that night, Mr. Conklin knows what happened, and he explained to you what happened." Having already presented substantial mitigating evidence during the guilt phase, we find that a reasonable attorney could have determined that any additional mitigating evidence at sentencing would not have been helpful.

Conklin also argues that Chason could have elicited more evidence about his troubled childhood, his history of mental problems, and his lack of violent behavior. In *Waters*, we rejected a similar claim because Waters's attorney called eight witnesses who testified favorably as to defendant's character and presented evidence that defendant was taking anti-psychotic medications. *See Waters*, 46 F.3d at 1517-18. As in *Waters*, Chason had already presented evidence from Conklin's father describing the petitioner's rough childhood. In addition, the federal habeas court, adopting the findings of the state habeas court, found that Chason (1) thoroughly researched and investigated possible defenses, (2)

consulted with a psychiatrist, (3) interviewed possible witnesses, (4) interviewed Conklin, (5) consulted with the medical examiner and police officers, and (6) employed an investigator to find potential witnesses. Because our principal concern is not whether counsel should have presented a mitigation case but rather whether the investigation supporting counsel's decision not to introduce mitigating evidence was itself reasonable, these actions rendered Chason's performance constitutionally sufficient. *See Wiggins v. Smith*, 123 S.Ct. 2527, 2536 (2003). Thus, on the whole, trial counsel's performance was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even assuming, *arguendo*, that Conklin could satisfy the first *Strickland* requirement, we find that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would not have been different had counsel introduced the mitigating testimony of Conklin's girlfriend and father. *See Strickland*, 466 U.S. at 694; *Wiggins*, 123 S.Ct. at 2542.

In an attempt to show prejudice, Conklin relies on *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, applying *Strickland*, the Supreme Court found actual prejudice because defense counsel (1) "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood;" (2) failed to present evidence that Williams was

26

"borderline mentally retarded;" (3) failed to seek prison records commending Williams for cracking a prison drug ring; (4) failed to illicit the testimony of prison officials that Williams was highly unlikely to act violently in prison; and (5) failed to return a phone call of a prison ministry member who would have testified that Williams "seemed to thrive in a more regimented and structured environment." *Williams*, 529 U.S. at 395-96.

Such potentially prejudicial omissions are not present in this case. Here, Chason simply chose not to present the testimony of Conklin's girlfriend and father, who might have been able to further humanize Conklin. This decision was not prejudicial because both had previously testified during the guilt phase. Thus, their testimony at sentencing would have been largely repetitive and therefore would not have been sufficient to overcome the evidence that Crooks's killing was "outrageously or wantonly vile, horrible or inhuman" so as to avoid the death penalty. *See* O.C.G.A. § 17-10-30(b)(7) (1981). As such, we reject Conklin's claim for ineffective assistance at sentencing.

## IV.   *AKE* CLAIM

Relying on *Ake v. Oklahoma*, 470 U.S. 68 (1985), Conklin argues that the

court erred in failing to provide him with funds to hire an independent pathologist for help in preparing his defense of lack of intent. Conklin argues that without the requested expert, he had no realistic opportunity to combat the testimony of Dr. Zaki, which tended to suggest an intentional killing.[12]

In *Ake*, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74. The Court reasoned that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* at 76. The Court, however, limited its holding to psychiatric assistance.

Conklin now attempts to expand *Ake* to cover requests for non-psychiatric

---

[12] Dr. Zaki testified that a knife was used to inflict multiple wounds that were, in his opinion, inflicted before death, while Conklin's testimony indicated that all knife wounds occurred after death. Conklin contends that an independent medical examiner could have helped him cast doubt on Dr. Zaki's testimony. According to Conklin, without an additional expert to counter-balance the testimony of Dr. Zaki, the jury had no realistic choice but to discredit Conklin's testimony. This inference is supported by the fact that Dr. Zaki had been a medical examiner for eleven years and had performed 3,500 autopsies, lending him a credibility that Conklin, an admitted killer, could not match without the testimony of an independent medical expert in support his version of the facts.

experts.  He bases his argument on the Court's statement in *Ake* that "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the . . . defense."  *Id.* at 80.  Conklin argues that this rationale applies to other experts.  However, the Supreme Court has not yet extended *Ake* to non-psychiatric experts.  *See Grayson*, 257 F.3d at 1231 (applying *Ake* for the sake of argument); *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987) (en banc) (refusing to decide whether *Ake* extends to non-psychiatric experts); *McKinley v. Smith*, 838 F.2d 1524 (11th Cir. 1988) (same).  We nonetheless assume, for sake of argument, that the due process clause could require the government to provide non-psychiatric expert assistance to an indigent defendant upon a sufficient showing of need.

Assuming, *arguendo*, that *Ake* extends to non-psychiatric experts, then we must determine (1) whether Conklin made a timely request to the trial court for the provision of expert assistance; (2) whether it was "reasonable" for the trial court to deny Conklin's request; and (3) whether the denial rendered Conklin's trial fundamentally unfair.  *See Moore*, 809 F.2d at 710 (noting that the Supreme Court in *Ake* followed this three-part analytical approach).  With respect to the third *Moore* requirement, we ask whether the *Ake* error "had substantial and injurious

29

effect or influence in determining the jury's verdict." *Hicks v. Head*, 333 F.3d 1280, 1286 (11th Cir. 2003). We find that Conklin satisfies the first two *Moore* requirements, but he cannot satisfy the third requirement.

Conklin satisfies the first *Moore* requirement because he made a timely request to the trial court for the provision of expert assistance. Conklin filed two written pretrial motions requesting funds for expert assistance, both on May 11, 1984. The first motion, entitled "Motion for Funds to Hire Experts to Aid in the Preparation of the Defense" reads, in pertinent part:

> Now comes the accused, Robert Dale Conklin and moves this Court
> to order funds be provided to counsel for Robert with adequate funds
> with which to hire experts as indicated in the preparation of his
> defense.
>
> We show the Court the following, in support, thereof.
>
> 1. Robert is an indigent, without resources to hire an attorney or
>    other expenses incidental to the defense of a criminal case.
>    . . .

30

3.     Physical evidence has been gathered by the Fulton County Medical Examiner [Dr. Zaki], and State Crime Lab.

4.     This evidence may have a bearing on the guilt or innocence of the accused.

5.     The accused must be prepared to defend himself at a bifurcated trial procedure and may require other experts to present in his defense.

. . .

7.     An accused has a constitutional right to be free from financial circumstances which could hinder his defense. *Griffin v. Illinois*, 351 U.S. 12.

8.     An accused has a right to have an expert of his own selection examine the physical evidence. *Patterson v. State*, 238 Ga. 204 (Ga. 1977); *Barnard v. Henderson*, 514 F.2d 744 (5th Cir. 1975).

9.      Fulton County has funds available.

10.     The amount of funds needed are not expected to exceed $2,500.00.

Conklin's second motion, entitled "Motion for Funds for Expert Witnesses," states in its entirety:

1.      The Accused is incarcerated in Fulton County Jail.

2.      He is indigent and has Court appointed attorneys, and without funds to provide financial assistance.

3.      Some experts are needed to assist defense counsel and involves the attorney-client privilege.

4.      Because the state is seeking the death penalty, *expert assistance of psychiatric, medical and other forensic aids are necessary*.

32

5.     Interviews by expert witnesses of the Accused may be a critical

stage of these proceedings.

Wherefore, the Accused moves this Court to grant sufficient

funds to aid in the preparation of his defense.

Conklin thereafter filed a renewed motion for funds for expert assistance on May 30,1984, seeking funds for "psychiatric, medical, and other investigative assistance." At an oral hearing held that same day, defense counsel stated, ". . . we will need some [] psychiatric assistance and perhaps a medical person to assist us in preparing the defense, because these could be critical issues not only in the . . . first phase of trial but in the bifurcated procedure." Counsel's requests for expert assistance were made before trial began. As such, they are enough to satisfy the first *Moore* requirement of a timely request.

We now turn to the second *Moore* factor – whether the trial court acted reasonably in denying the defendant's requests for expert assistance. Relying on *Stephens v. Kemp*, 846 F.2d 642 (11th Cir. 1988), the federal habeas court found that it was reasonable for the trial court to deny Conklin's requests for assistance.

*See Conklin v. Thomas*, No. 1:95-CV-914A-JEC, at 33 (N.D. Ga. Aug. 28, 2001) (order denying federal habeas relief).[13]  The federal court's determination is reviewed de novo.  *See Singletary*, 155 F.3d at 1304.

In determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on the particular motion.  *Moore*, 809 F.2d at 710-13. The reasonableness of a judge's denial "necessarily turns on the sufficiency of the petitioner's explanation as to why he needed an expert."  *Id.* at 710.  Thus, we ask whether the trial judge should "have concluded that unless he granted his request petitioner would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense."  *Id*.

Conklin argues that the trial court acted unreasonably in failing to grant his

---

[13] The district court relied heavily on the requirements adopted by this Court in *Stephens*. In *Stephens*, we ruled that the reasonableness of a denial for expert assistance turns on:

> [First] (1) whether the trial judge was informed of the specific evidence which incriminates the defendant, and (2) whether the information which would assist the defendant could be obtained through the state's experts.  Secondly, counsel must provide a reasonably specific description of the expert services sought.  A reviewing court must therefore examine: (1) whether counsel delineated the specific type of expert sought; (2) whether the trial court was informed as to the availability and costs of the expert who would perform the requested services and, if known, the name of the expert sought, and (3) whether counsel has shown how the expert would contribute to the defense.

*Stephens*, 846 F.2d at 647.

requests because the court was well aware that his sole defense was lack of intent and that the state's medical expert would seriously undermine that defense. Thus, he argues, the court should have given him the funds necessary to combat the testimony of Dr. Zaki. We agree.

Because Conklin's trial occurred before *Ake*, *Stephens*, or *Moore* were decided, in his first motion of May 11, 1984, Conklin properly requested "an expert of his own selection" pursuant to *Patterson v. State*, 232 S.E.2d 233 (Ga. 1977), and *Barnard v. Henderson*, 514 F.2d 744 (5th Cir. 1975). In *Barnard*, in reversing a habeas denial, the former Fifth Circuit held that the defendant should have been granted an independent ballistics expert of his choosing "since one of the most damaging pieces of evidence against [the defendant] was the identification of the murder bullet as having been fired by a . . . pistol traced to his possession." *Barnard*, 514 F.2d at 746.[14] The *Barnard* court ruled,

> The question is not one of discovery but rather the defendant's right to the means necessary to conduct his defense. [We believe that] . . . 'the only means by which the defendant can defend against expert testimony by the State is to offer expert testimony of his own.'. . .

---

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all published decisions of the former Fifth Circuit issued before October 1, 1981.

*Fundamental fairness is violated when a criminal defendant on trial*

*for his liberty is denied the opportunity to have an expert of his*

*choosing, bound by appropriate safeguards imposed by the Court,*

*examine a piece of critical evidence whose nature is subject to*

*varying expert opinion.*

*Id.* at 746 (emphasis added).

In the other case cited in Conklin's motion, *Patterson v. State*, 232 S.E.2d 233 (Ga. 1977), the Georgia Supreme Court reached a similar result. The court held, "[w]here the defendant's conviction or acquittal is dependent upon the identification of [a] substance as contraband, due process of law requires that analysis of the substance not be left completely within the province of the state." *Id.* at 206. The court then set forth requirements for the specificity of a request for additional expert assistance, stating "[t]he motion for an independent examination must be timely made," and "[t]he request must be reasonable." *Id.* The Georgia Supreme Court, however, did not set forth any additional requirements, such as those later adopted in *Moore* and *Stephens*. Having been placed on notice of this authority, being fully aware that lack of intent was Conklin's sole defense, and in view of the fact that *Ake*, *Moore*, and *Stephens* had not been decided at the time of

36

Conklin's trial, we find that the trial court acted unreasonably in denying Conklin the funds necessary to present an effective defense.[15]

Although Conklin can satisfy the first two *Moore* requirements, he cannot satisfy the third requirement because he cannot show that the alleged *Ake* error had "substantial and injurious effect or influence in determining the jury's verdict." *Hicks*, 333 F.3d at 1286. In his request for habeas relief, Conklin points to the affidavit of Dr. Werner U. Spitz[16] as an example of evidence he could have presented had the trial court granted his requests for assistance. In his affidavit, Dr. Spitz asserts, "[b]ased upon my review of these records, it is my opinion, within a reasonable degree of medical and scientific certainty, that Dr. Zaki's

---

[15] Even if we were to follow the district court and apply the requirements of *Stephens*, we would reach the same result. At the time of Conklin's trial, without the assurance of mandatory *ex parte* proceedings as provided by *Ake*, Chason was justified in omitting from his motions detailed and precise information as to how the requested assistance would be used in presenting Conklin's defense. *See Stephens*, 846 F.2d at 647. In his affidavit submitted to the state habeas court, Chason noted that he did not make his motions more specific because he was rushed and because he "believed that the facts of the case provided significant notice to the judge that an expert was necessary." Even a brief review of the trial transcript confirms that the trial court was well aware that in order to present his sole defense, Conklin would have to first analyze and then attack the findings of the state's medical expert. Armed with this knowledge, and because Conklin was an indigent defendant incapable of obtaining the needed assistance, the trial judge should "have concluded that unless he granted [Conklin's] request, [he] would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense." *See Moore*, 809 F.2d at 710.

[16] Dr. Spitz is the editor and co-author of the authoritative text entitled MEDICOLEGAL INVESTIGATION OF DEATH (Werner U. Spitz ed., 3d ed. 1993). Before issuing his affidavit, Dr. Spitz reviewed trial testimony and various materials obtained from state authorities regarding the autopsy of the deceased in this case.

opinion whereby the knife wounds to Mr. Crooks necessarily occurred before and contributed to death or that bruising to the body necessarily occurred before death, is unsupportable. . . . It is further my opinion that the materials reviewed by Dr. Zaki do not conflict with Conklin's description about how the killing and post-killing events occurred."[17] According to Conklin, this or similar testimony would have provided the jury with a realistic opportunity to believe his version of the events.

We reject Conklin's argument for three reasons. First, based on his affidavit, Dr. Spitz's testimony would have sought to undermine Dr. Zaki's opinion that the eight knife wounds to the neck occurred before and contributed to death. However, the proffered testimony of Dr. Spitz would have simply reiterated Dr. Zaki's concessions made on cross-examination that the knife wounds could have been inflicted up to an hour after Crooks's death. *See Grayson*, 257 F.3d at 1232 (rejecting a similar claim because the proposed testimony was cumulative and would not have changed the trial's outcome).

Second, it is unlikely that the additional testimony would have altered the jury's adverse credibility determinations. Conklin took the stand and recounted his version of the events, which pointed to a killing in self-defense. However, the

---

[17] Letter from Dr. Spitz dated Aug. 31, 1995.

jury chose not to believe him. We are unable to revisit the jury's determination. *See Chastain*, 198 F.3d at 1351. While the proffered testimony from Dr. Spitz might have helped Conklin's overall defense, it would not have likely altered the jury's decision to discredit Conklin's testimony, upon which his defense ultimately rested.

Finally, in addition to Dr. Zaki's opinion, the jury also had before it substantial evidence supporting a finding of implied malice. First, Detective Cook of the Fulton County Police Department testified that he found "several knives, five screwdrivers, and a length of rope" in the dumpster where Crooks's body was discovered. Second, Conklin's statements implying an accidental killing can be viewed as inconsistent with the events occurring after Crooks's death. Rather than calling the police to report the alleged accident, Conklin dismembered Crooks's body, methodically destroyed evidence connecting him to the crime, showed no immediate remorse for his actions as evidenced by having friends over to his apartment for drinks, attempted to alter his identity, and then fled the state. In addition, the police recovered an instruction manual from Conklin's apartment describing how to slaughter animals in the same manner that Conklin admitted to having treated Crooks's body, implying that Conklin planned his crime in advance.

39

Because Conklin has failed to show that an independent expert would have testified that a knife was in fact used only to inflict postmortem injuries, and in light of the substantial evidence in support of a finding of implied malice, we find no prejudice in the trial court's refusal to appoint an independent pathologist.

## V.    CUMULATIVE EFFECTS CLAIM

In *United States v. Blasco*, 702 F.2d 1315 (11th Cir. 1983), we noted that "[a] piecemeal review of each incident does not end our inquiry.  We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." *Blasco*, 702 F.2d at 1329 (citing *United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978)).  Relying on *Blasco*, Conklin argues that the trial court's apparent rush to trial, the court's error in denying funds for an independent pathologist, and the conduct of his trial counsel combined to rob him of a fair trial and sentencing.

We are unable to understand why a trial judge would refuse to grant a short continuance and afford a first-degree murder defendant $2,500 of available state funds to hire an expert crucial to his defense.  Yet, we cannot say that Conklin's

trial, as a whole, was fundamentally unfair and outside of the bounds of the Constitution.

We affirm the district court's denial of Conklin's federal habeas corpus petition.

**AFFIRMED.**

EDMONDSON, Chief Judge, concurring in the result.

I also would affirm the district court's judgment.  I believe the <u>Ake</u>-based claim has weaknesses beyond the one pointed to by Judge Wilson.

BARKETT, Circuit Judge, dissenting:

I will confess that the grisly facts of this case easily tempt one to merge Conklin's killing of the victim with his acts upon the body after death. However, notwithstanding the atrocious desecration of the body,[1] Conklin was entitled to a fair determination of whether he was guilty of murder or whether, as he claims, he killed George Crooks in self-defense and mutilated the body after death had occurred. I do not believe he received the opportunity to which he was entitled under the Sixth Amendment's guarantee of a fair trial with effective assistance of counsel. In light of the complexity of this case, the severe limitations on time and resources imposed by the trial court made it impossible for Conklin to receive constitutionally adequate assistance.

Conklin's lawyer, assistant public defender Tommy Chason, was assigned Conklin's case on May 4, 1984, the same day Georgia gave notice of its intention to seek the death penalty. The trial was scheduled to commence thirty-seven days later on June 11, 1984. The state did not provide defense counsel with a copy of the indictment or the required exculpatory and mitigating evidence until May 24,

---

[1]Conklin was charged only with murder, not with any separate crime connected to the desecration of the body. The state argued that the desecration of the body was relevant to both the defendant's state of mind and the question of whether the murder was "outrageously or wantonly vile, horrible, or inhuman," an aggravating circumstance under Georgia law. See Geo. Code Ann. § 17-10-30(b)(7).

less than three weeks before trial. The court denied repeated requests to delay the trial despite counsel's statements that he was unprepared. The court also denied repeated requests for a small amount of money to hire expert medical assistance, which Conklin could not otherwise afford. After the jury returned its verdict, Conklin's attorney again asked for additional time to prepare for sentencing. The trial judge refused this request, and Conklin was sentenced to death the following day. His lawyer presented no mitigating evidence whatsoever during the sentencing phase.

The primary evidence of what happened on the night Robert Crooks died came from the statements made by Conklin and forensic evidence based on the condition of the body. The majority briefly mentions Conklin's testimony that Crooks was killed in a struggle attempting to force Conklin to have anal sex.[2] There was no direct evidence to contradict Conklin's statements. The government's case depended upon the testimony of the state's medical examiner, Dr. Saleh Zaki, who opined that certain stab wounds were inflicted prior to, rather than after, death. Thus, the most important evidence in this case as to whether to convict or acquit on the charge of murder consisted of technical forensic

---

[2]Conklin claimed that Crooks, who was 6'2" tall and weighed about 200 pounds, while Conklin was 5'7" tall and weighed about 150 pounds, tried to force him to have anal sex, something he had never consented to do.

evidence.[3]

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." United States v. Cronic, 466 U.S. 648, 659-60 (1984). In my judgment, Conklin's case rises to that level. His attorney had thirty-seven days to prepare a complex capital case involving highly technical medical evidence, detailed expert testimony, potential psychological defenses, a troubled mental history, and unusual legal issues, including the consequences of Conklin's postmortem treatment of the body. The court denied repeated requests for a court-appointed forensic pathologist or medical expert despite the state's reliance upon forensic evidence of multiple antemortem stab wounds in order to demonstrate malice aforethought and despite Conklin's need to challenge that evidence in order to present his defense. The court also denied requests for a state-appointed mental

---

[3]The government argued that Conklin had killed Crooks during a lover's quarrel and relied heavily upon the large number of stab wounds. The government claimed that 34 stab wounds could not possibly have been inflicted in self-defense. Conklin claims that most of these wounds were inflicted after death as part of his attempt to drain the blood and dispose of the body. Whether the wounds occurred before or after death was therefore critical to the case.

health expert for the guilt and sentencing phases.  In my view, the likelihood that even a fully competent lawyer could have mounted an effective case for acquittal or for a life sentence in these circumstances is so remote as to render his trial presumptively unfair.

The nature of Conklin's case made thirty-seven days woefully inadequate to the simultaneous tasks of preparing for trial, crafting effective pretrial motions and presentations, and laying the groundwork for an alternative strategy at sentencing. Conklin's attorney actually accomplished a fair amount in that time, but the severe time constraints simply precluded effective representation.  As the majority notes, he investigated possible defenses, submitted and defended pretrial motions, interviewed witnesses, hired an investigator to find additional witnesses, and consulted outside experts.  However, compressing such an overloaded agenda into such a short time period made it virtually impossible to accomplish those tasks effectively.[4]  Conklin's attorney may not have needed the months or years obtained by some defendants with considerable financial resources in criminal or civil cases, but thirty-seven days in this situation hardly satisfies minimum

---

[4]For example, Chason failed to ask Chuck Desederio questions about Crooks' general reputation for violence after the judge disallowed several specific statements. See Majority Op. at 21. Chason also failed to develop sufficiently detailed background materials to supplement his requests for psychiatric evidence. See District Ct. Order at 69-72, 143-45. The trial court also admonished Chason for his inability to present evidence in support of pretrial motions in a timely manner. See Tr. of May 11, 1984, Hr'g at 48-49.

46

constitutional standards.

Despite these obstacles, Chason found an expert witness who would unequivocally testify that no medical examiner could state with certainty that the wounds were caused before death. The trial court denied the necessary funding. The majority discounts the inability to present this expert testimony because Dr. Zaki did admit on cross-examination that the antemortem wounds might have been inflicted shortly after death, possibly up to an hour later (though he suggested that fifteen minutes would be more realistic). However, Dr. Zaki had already stated on direct examination that the same wounds had occurred before death. A concession in cross-examination that the wounds he affirmatively said were inflicted before death could equally have occurred after death cannot substitute for the presence of another, equally qualified expert who would have directly testified to the plausibility of Conklin's version of events. The jury could have judged the credibility of each expert and weighed the testimony accordingly. Dr. Zaki was absolutely central to the prosecution's case, as the majority acknowledges in dismissing Conklin's claim of insufficient evidence for conviction. Op. at 13. "Meaningful adversarial testing" of the government's case depended upon Conklin's ability to challenge Dr. Zaki.

The majority also downplays the significance of Chason's failure to present

47

any mitigating evidence at the sentencing phase of Conklin's trial. In effect, the majority accepts the state court's finding that Chason made a "tactical decision" not to present additional mitigating evidence. However, "tactical" implies a choice made in order to achieve another purpose. In this case, neither the state habeas court nor the majority cites any plausible advantage Chason obtained by deciding to forgo any and all mitigating evidence at the sentencing phase. Rather, the majority merely notes that Chason presented testimony from Conklin's father and girlfriend at the guilt phase and then referred to this testimony in his closing argument. Op. at 24. Nothing explains the failure to present additional evidence about Conklin's history of mental problems or his violent childhood apart from Chason's lack of time and resources.

The majority's treatment of Chason's mitigation "strategy" underscores why I believe Conklin's case rises to the level of per se ineffective assistance of counsel. Following the analysis outlined in Strickland v. Washington, 466 U.S. 668 (1984), the majority asks whether a reasonable attorney in Chason's position would have elected to present mitigating evidence. The majority finds Chason's decision "questionable," Op. at 18, but ultimately concludes that a reasonable attorney might have determined that the additional testimony available to Chason "would not have been helpful." Op. at 24. However, the hypothetical attorney in

48

Chason's position would have had insufficient time to prepare a full case at the penalty phase: the trial judge denied requests for additional time as well as the funds necessary to secure a psychiatric expert. Such an attorney would essentially face a choice between presenting an incomplete and ill-prepared case in mitigation and completely forgoing an explicit case in mitigation. No attorney can make a reasonable choice in these circumstances because neither alternative is reasonable.[5]

Finally, the majority feels "compelled" to reject Conklin's Cronic claim because the attorney in Cronic itself had only twenty-five days to prepare without any prior experience with the type of case before him, while Chason had thirty-seven days to prepare and had already handled a few death penalty cases. However, Cronic does not stand for the proposition that twenty-five days or more of preparation may never trigger a presumption of ineffective assistance. Rather, the Court held that the "surrounding circumstances" did not justify the presumption in that case. The defense attorney in Cronic had only requested thirty days to prepare for trial, and the trial court actually granted twenty-five days. 466 U.S. at 663. Most of the government's case for mail fraud in Cronic involved

_____

[5]Of course, the choice not to present any case in mitigation seems particularly unreasonable, given that Chason had nothing to lose.

49

documenting specific financial transactions, which were not open to serious challenge. Id. at 664. Given that the defendant's intent to defraud was "the only bona fide jury issue open to competent defense counsel" and that there was "no reason to dispute the underlying historical facts," the Court rejected the "presumption that no lawyer could provide the respondent with the effective assistance of counsel required by the Constitution." Id. at 664-65.

Similarly, although the Avery Court rejected a claim of per se ineffective assistance despite only three days of preparation, that holding, too, turned upon "the particular circumstances appearing in this record." Avery v. Alabama, 308 U.S. 444, 450 (1940). Three witnesses testified that they saw the defendant shoot his wife, the defendant admitted he had traveled several miles to look for her, and the court-appointed attorneys had questioned many people in the small, rural community, none of whom "could offer information or assistance helpful to the defense." Id. As the Court concluded, "[t]hat the examination and preparation of the case, in the time permitted by the trial judge, had been adequate for counsel to exhaust its every angle is illuminated by the absence of any indication, on the motion and hearing for new trial, that they could have done more had additional time been granted." Id. at 452.

Conklin's case differs significantly. Unlike the situation in Cronic, the

"underlying historical facts" were very much in dispute, requiring forensic evidence and expert testimony to resolve. Defense counsel requested continuances and expert witness funding in order to develop his challenge to those facts, and the trial court denied each of these motions. Unlike the situation in Avery, Conklin has suggested specific ways in which his defense would have differed had he been given the time and resources necessary for constitutionally adequate assistance.[6]

Given the complexity of the evidence, the failure of the trial court to provide the time and resources necessary to present a reasonable defense, and the special context of a capital case,[7] I believe that the circumstances would have prevented any attorney from providing competent assistance. I would grant the habeas corpus petition and remand for a new trial.

---

[6]Similarly, although we rejected a Cronic claim despite a very short time to prepare in Chadwick v. Green, 740 F.2d 897, 901 (11th Cir. 1984), we noted in that case that the historical facts were not in dispute and that defense counsel had made no effort to contact the psychiatrist or verify the petitioner's claims of insanity. In the case at hand, the historical facts were in dispute, and Conklin has shown that expert testimony would have bolstered his case.

[7]See, e.g., Gardner v. Florida, 430 U.S. 349, 358-59 (1977) ("[D]eath is a different kind of punishment from any other which may be imposed in this country. . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.") (citations omitted).