[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11384

_____

D.C. Docket No. 5:12-cv-00163-CAR

JOHN ANTHONY ESPOSITO,

Petitioner-Appellant,

versus

WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 23, 2020)

Before JILL PRYOR, TJOFLAT and MARCUS, Circuit Judges.

PER CURIAM:

In this capital case, John Esposito appeals the district court's denial of his federal habeas petition. Esposito was sentenced to death in Georgia following his conviction for the murder of Lola Davis. Following an unsuccessful direct appeal and collateral proceedings in Georgia state courts, Esposito filed a federal habeas petition in the United States District Court for the Middle District of Georgia, which the district court denied. Esposito appeals the denial of his petition on three claims of ineffective assistance of counsel. First, he contends that his trial counsel were ineffective in failing to investigate and present evidence that he was less culpable than his codefendant, Alicia Woodward. Second, he contends that his trial counsel were ineffective in failing to investigate and present in the penalty phase of his trial mitigation evidence about his childhood abuse and history of mental illness. Third, he contends that his trial counsel were ineffective in making their closing argument in the penalty phase.

After a thorough review of the briefing and the record, and with the benefit of oral argument, we affirm the denial of Esposito's petition.

## I.    BACKGROUND

Esposito was convicted in Georgia of malice murder. A jury recommended a death sentence, and the trial court accepted the recommendation. Below we describe the events that led to Esposito's conviction and sentence, as well as evidence, as relevant here, presented at his state habeas proceedings.

2

## A. Factual Background

Esposito and his girlfriend, Alicia Woodward, abducted Davis, an elderly woman, from a grocery store parking lot in North Carolina.[1] Woodward approached Davis in the parking lot and convinced Davis to give her a ride. Woodward directed Davis to drive to a nearby location, where Esposito was waiting. Esposito entered Davis's car and forced her to move to the passenger seat. With Woodward driving, Esposito took $1,000 and a checkbook from Davis's purse. Esposito and Woodward drove her to a local bank, where they forced her to cash a check for $300. They then drove her to a remote location, where Esposito led her into a hayfield, forced her to kneel, and beat her to death with a tree limb. After Davis's murder, Esposito and Woodward drove to Alabama, where they disposed of Davis's car and purse. When they ran out of money, they abducted an elderly couple in Oklahoma, robbed them, and bludgeoned them to death with a tire iron. *Esposito v. State*, 538 S.E.2d 55, 57 (Ga. 2000).

Esposito and Woodward were arrested in Colorado. *Id*. at 57–58. Esposito gave two confessions to law enforcement. He made his first confession to FBI agents on the day of his arrest. During the 45-minute interview, Esposito admitted

---

[1] The facts come from the evidence adduced at trial, which was summarized by the Georgia Supreme Court in *Esposito v. State*, 538 S.E.2d 55 (Ga. 2000) (affirming Esposito's conviction and death sentence on direct appeal).

that he forced Davis to get out of the car and kneel on the ground.  He confessed to hitting her several times with a tree limb.  He also admitted to murdering the Oklahoma couple, recounting that the murder "wasn't too bad" because he "didn't get any brains on [his] face or anything."  Doc. 13-13 at 58.[2]  He told FBI agents that after he bludgeoned the wife, she had brain matter on her face and one of her eyes was coming out of her head.

A few days later, Esposito gave a more detailed confession in a videotaped interview with a Georgia Bureau of Investigations agent.  He again admitted to murdering Davis.  He confessed that he hit Davis with a tree limb and kicked her with his shoe.

## B.  Motion to Suppress

Esposito was indicted in Georgia for Davis's murder.  The trial court appointed two criminal defense attorneys, Roy Robinson Kelly III and W. Dan Roberts, to represent him.

Before trial, Esposito's counsel sought to suppress both of his confessions.  The trial court concluded that the first confession would be admissible in evidence at trial.  The court suppressed the second, videotaped confession, however, after

---

[2] Citations in the form "Doc. #" refer to entries on the district court's docket.  Documents from the state habeas proceedings have been electronically filed; this opinion cites to the electronically-generated page numbers located on the top margin of each page.

determining that it violated Esposito's *Miranda*[3] rights.  In response, the state

argued that the videotaped confession nevertheless could be used for impeachment

or rebuttal purposes.  After ruling that the illegally obtained confession could be

introduced only if Esposito testified, the court clarified that the state could use it

for impeachment or rebuttal purposes.

## C.  Trial

### 1.  Guilt/innocence phase

At the guilt/innocence phase of Esposito's trial, the state presented evidence

that Esposito and Woodward abducted Davis, stole from her, and drove her to a

remote area, where Esposito brutally murdered her.  FBI Agent Ron Knight

testified that when he interviewed Esposito after the arrest, Esposito told him that

the murders were "all [him].  [Woodward] didn't do anything."  Doc. 14-15 at 49.

Esposito admitted to kidnapping Davis from a grocery store parking lot, and when

Knight asked what happened next, Esposito responded "I killed her."  *Id*. at 53.

Esposito confessed to hitting Davis with a tree limb.  During the interview,

Esposito told Knight, "I don't have any remorse [about the murder].  I don't have a

conscience."  *Id*. at 56.  The state did not introduce into evidence the videotaped

confession.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

A crime scene specialist testified that Davis's car contained fingerprints, palm prints, and footprints matching those belonging to Esposito and Woodward. Also, a cigarette butt found in the car contained DNA that was consistent with Esposito's DNA. The state submitted photographs showing that a tree limb was found at the murder site, and hair was found on the limb. A forensic analyst testified that one branch contained 63 hairs that matched Davis's hair. The tree limb was never tested for DNA evidence.

The jury also heard testimony from the doctor who performed Davis's autopsy. The doctor testified that Davis died of blunt force trauma. He testified that he could not be sure what type of object caused the trauma, but Davis's injuries were consistent with being hit by an item with bark on it, so it was possible that a tree limb was the murder weapon.

The jury heard that Woodward was larger physically than Esposito: Esposito weighed about 160 pounds and Woodward weighed about 180 pounds. The jury learned, too, that Woodward: (1) booked and paid for their hotel rooms during their crime spree, (2) drove Davis's car, and (3) was the first to approach Davis in the grocery store parking lot.

The state rested. The defense rested without calling any witnesses. In closing argument, Esposito's counsel emphasized that the tree limb had never been tested for the presence of DNA.

The jury found Esposito guilty of murdering Davis.

2. *Penalty phase*

At the penalty phase, the state introduced evidence about the murder of the Oklahoma couple. The jury heard that Esposito had confessed to murdering the couple and beating the wife until her brain matter appeared on the side of her face and her eye popped out of her head.

Esposito called seven witnesses in mitigation. These witnesses testified about Esposito's disposition, background, and mental capacity. Specifically, the jury heard from: the chief jailer for the Jasper County jail, who testified that Esposito was a "model inmate" who "never caused any problems" while he was in jail pending trial; Esposito's high school teacher, who testified that Esposito was a "follower" who had a "totally dysfunctional" and "aggressive" mother; Esposito's aunt, who recounted that Esposito was physically, verbally, and sexually abused as a child; and Esposito's General Education Development (GED) instructor, who testified that Esposito was "very intelligent," "high functioning" in academics, and a "follower" who did not "initiate things by himself." Docs. 14-20 at 72; 14-21 at 80–81; 14-23 at 46, 48. Two witnesses—a psychiatric nurse and therapist at a state psychiatric hospital—testified that they were not convinced that Esposito was the killer.

Esposito's final mitigation witness was Dr. Daniel Grant, a psychologist who had examined Esposito, interviewed him, administered tests to him, and reviewed his medical records. In contrast to the GED instructor's testimony that Esposito was "very intelligent," Grant opined that Esposito had average to slightly below average intelligence and a simplistic, naïve view of the world. Esposito lacked confidence and was not good at making decisions. According to Grant, Esposito was "passive, submissive, dependent[,] and self-conscious." Doc. 14-24 at 24. Grant explained that Esposito had a history of five or six prior suicide attempts and had engaged in self-mutilation. He also testified that Esposito had "extreme reactivity and sensitivity." *Id*. at 25. He noted that Esposito had reported that he was sexually abused as a child and had, at one point, been forced to perform oral sex on his stepfather.

The state successfully used cross-examination to bring out unfavorable evidence about Esposito. The jury heard that: Esposito's mother obtained a restraining order against him, he had been involved in devil worship, he was placed in a psychiatric facility after he assaulted and threatened to kill his family, he was kicked out of a GED program after he threated to "kill . . . everybody," and he tortured animals and wrote letters about killing and raping. Doc. 14-23 at 50.

8

In closing argument, the state emphasized the aggravating circumstances that warranted the death penalty.[4]  Esposito's counsel gave a brief closing argument—filling just over four pages of transcript—in which he stated that "there is no question that [Esposito] has . . . lots of problems," complimented the prosecutor, and noted that the "most popular thing" for the jury to do would be to sentence Esposito to death.  Doc. 14-25 at 2–3.

The jury unanimously recommended a sentence of death.  The judge adopted the jury's recommendation and imposed a death sentence.

## D.  Direct Appeal and State Habeas Proceedings

The Georgia Supreme Court affirmed Esposito's conviction and death sentence on direct appeal.  *See Esposito*, 538 S.E.2d at 60.  Esposito then initiated state habeas proceedings.  In his counseled state habeas petition, he argued that his trial counsel were constitutionally ineffective in failing to: (1) develop and present evidence suggesting that Woodward, not Esposito, was the killer; (2) develop and present in the penalty phase evidence about Esposito's abuse as a child and his mental illness; and (3) make an adequate closing argument during the penalty phase.

---

[4] The aggravating circumstances were that:  (1) the murder was committed in the course of an armed robbery, (2) the murder was committed in the course of a kidnapping with bodily injury, and (3) the offense was outrageously or wantonly vile because Davis was disfigured by the beating.

9

The state habeas court conducted an evidentiary hearing on Esposito's ineffective assistance of counsel claims.  At the hearing, Esposito's habeas counsel presented testimony from several witnesses, including Kelly and Roberts, the investigator who worked on Esposito's trial, and Esposito's ex-girlfriend.

Kelly and Roberts testified about their legal experience and detailed their investigation and preparation for Esposito's capital trial.  They both had worked on multiple capital cases before Esposito's trial, and they previously had worked together on a death penalty case.  In preparing for Esposito's trial, they realized it was likely that he would be found guilty; thus, their goal was to help him avoid the death penalty.

Kelly testified that he and Roberts hired an investigator, Hector Guevara, to do the investigation into possible mitigating evidence for the penalty phase. During his investigation, Guevara regularly met with Kelly and Roberts.  All three visited Esposito, whom Guevara questioned about his background, on multiple occasions.  Guevara provided Kelly and Roberts with a list of more than 80 people he had interviewed.  Among those interviewed were Esposito's family members, friends, teachers, coaches, counselors, psychiatrists, social workers, and army recruiters.  Guevara also interviewed people who knew about Woodward's past, including her former employers, friends, and family members.  Guevara provided Kelly and Roberts with written reports summarizing his findings.

Trial counsel testified that they were aware that Esposito had mental health issues and obtained his mental health records as part of their trial preparation. They also consulted a DNA expert to assist them in cross-examining the state's forensic expert. Kelly explained that part of their trial strategy was to show that no evidence—other than the confession—connected Esposito to the murder weapon because the state failed to gather DNA evidence from the tree limb.

Dr. Jonathan Arden, a forensic pathologist, testified that he reviewed Davis's autopsy report, photographs of the autopsy, and crime scene photographs. Arden opined that the shape of her injuries indicated that she had been struck with a man-made object, not a tree limb. When asked if it were possible that Davis was murdered with a tree limb, Arden responded that he did not know because "almost anything in the world is possible." Doc. 17-9 at 42.

Courtney Veach, Esposito's ex-girlfriend, testified that she witnessed firsthand the abuse inflicted on Esposito by his mother. She testified that he had bruises on his body from his mother's beatings. She further testified that his mother engaged in inappropriate sexual behavior. For instance, she would have loud sex when Veach and Esposito were in her home, and she tried to get them to have sex there. Veach testified that Esposito told her that when he was younger his mother made him watch her have sex with different men. Veach recounted that she was supposed to testify at Esposito's trial. Guevara was supposed to meet her

11

at the airport; however, they could not find each other there.  When she finally arrived at the courthouse, defense counsel told her that they would not call her as a witness because they did not have time to prepare her to testify.

Besides the testimony described above, Esposito presented the habeas court with affidavits from other potential fact witnesses.  Esposito's kindergarten and fourth grade teachers swore that they would have testified at trial about the abuse inflicted on him by his mother and stepfather.  Both teachers would have testified that, when Esposito was in the fourth grade, he reported to school employees that he was molested by a man while walking to school.  Esposito's stepfather, Wayne Deese, swore by affidavit that Esposito would occasionally "shake uncontrollably and beat his head on the floor," and to make him stop his mother would stick his head under the faucet.  Doc. 17-21 at 77.  Deese's sister, Cynthia Massari, submitted an affidavit attesting that when Esposito was three years old, his mother threw him against the wall and threatened to punch him after he spilled his milk.

Lastly, Esposito submitted affidavits from witnesses who would have testified about Woodward's violent tendencies and her negative influence on him. Those witnesses included Heather Bryan, Woodward's ex-girlfriend, who described Woodward as possessive and violent and recounted a time when Woodward threatened her with a butcher knife; Robert Noble III, Woodward's ex-boyfriend, who said Woodward stalked him and tried to run him over with a car;

12

and Patricia Holliman, Esposito's former landlord, who swore that before he met Woodward, Esposito was quiet, responsible, and attended church regularly, but after he met Woodward, "[e]verything changed," and he stopped going to church and would disappear for days at a time. Doc. 17-22 at 29.

The state habeas court denied Esposito's petition. The Georgia Supreme Court denied Esposito's application for a certificate of probable cause to appeal the state habeas court's order.

## E.  Federal Habeas Proceedings

After he had exhausted his state appeals, Esposito filed a petition for a writ of habeas corpus in federal district court, raising the same ineffective assistance of counsel claims he raised in state court. The district court denied Esposito's petition but granted him a certificate of appealability ("COA") on two issues:  first, whether trial counsel were ineffective in failing to investigate and present evidence to support the defense theory that Esposito was less culpable than Woodward; and second, whether trial counsel were ineffective in failing to investigate and present in the penalty phase mitigating evidence of his childhood abuse and mental illness. We expanded Esposito's COA to include his claim that his trial counsel were ineffective in presenting penalty phase closing argument.

## II.    STANDARDS OF REVIEW

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (internal quotation marks omitted). When we review state habeas court decisions in federal habeas, we "look through" unreasoned decisions of state appellate courts and presume that they adopted the reasoning of the last related state court decision, unless the state shows that the appellate court relied, or most likely relied, on different grounds. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Here, because the Georgia Supreme Court's denial was a summary one, we review the state habeas court's decision.

When a state court denies habeas relief on the merits, we review that decision under the standards set by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Williams v. Taylor*, 529 U.S. 362, 402–03 (2000). Generally, AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  With respect to § 2254(d)(2), "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015).

"Where we have determined that a state court decision is an unreasonable application of federal law under [] § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

## III.    DISCUSSION

Under *Strickland v. Washington*, a defendant has a Sixth Amendment right to effective assistance of trial counsel in his criminal proceedings.  466 U.S. 668, 686 (1984).  Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when the deficient performance prejudiced the defense, meaning that "there is a reasonable

15

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 694. A "reasonable probability" of a different outcome is "a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The petitioner bears the burden of proving his ineffective assistance claim, and he must meet his burden on both *Strickland* prongs—performance and prejudice—to succeed. *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010). We "need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (internal citation omitted). When analyzing a claim of ineffective assistance under § 2254(d), this Court's review is "doubly" deferential on counsel's performance. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). Thus, under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

We now turn to Esposito's individual ineffective assistance claims.[5]

---

[5] We note at the outset that Esposito contends that the state habeas court applied the wrong prejudice standard in rejecting his ineffective assistance claims. He argues that the court required him not only to meet the *Strickland* prejudice standard but also to show that the "result of the proceeding was fundamentally unfair or unreliable." Supp. Appellant's Br. at 14 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)); *see Williams*, 529 U.S. at 391 (holding in Part IV that *Lockhart* did not modify or supplant the *Strickland* standard). We disagree. Despite arguably having suggested initially that Esposito had to clear an additional hurdle to show

16

## A. Failure to Investigate and Present Evidence of Relative Culpability

Esposito first contends that his trial counsel were ineffective in failing to investigate and present evidence about his culpability in the murder relative to Woodward's. He explains that counsel's defense strategy was to cast doubt on his culpability by highlighting Woodward's potential culpability. Namely, counsel intended to show that Woodward was "the driving force behind the crimes and may well have committed the murders," while Esposito was a follower who was coerced into committing the crimes. Appellant's Br. at 13. He argues that counsel were deficient in pursuing this strategy at trial because they failed to: (1) investigate and present forensic evidence suggesting that the tree limb was not the murder weapon, which would have cast doubt on his confession that he, not Woodward, killed Davis, and (2) properly investigate and present evidence of Woodward's background and character.

The state habeas court rejected these arguments, concluding that Esposito's counsel's performance was not unconstitutionally deficient because they adequately investigated Woodward's role and elicited testimony about her relative culpability at trial. The court further concluded that even if counsel's performance

prejudice, a review of the court's order shows that it never actually applied the heightened prejudice standard. Throughout its order, the court explained that Esposito was required to show a "reasonable probability" that, absent his counsel's deficiencies, the "outcome of [his] trial" would have been different. Doc. 27-39 at 29, 35, 42. Thus, the court applied the correct prejudice standard from *Strickland*.

17

were deficient, there was no reasonable probability that additional evidence regarding Woodward's culpability would have affected the outcome of the trial.

We consider these arguments in turn.

1. *Failure to investigate or present forensic evidence to undermine Esposito's confession*

Esposito argues that his counsel were ineffective for failing to investigate and present forensic evidence casting doubt on whether the tree limb was the murder weapon. First, we must review counsel's performance under AEDPA deference. *See* 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1), the state habeas court's rejection of Esposito's deficient performance contention was neither contrary to, nor involved an unreasonable application of, *Strickland*. *Id.* Defense counsel retained a DNA expert in preparation for trial, cross-examined the state's forensic expert about the state's failure to test the tree limb for DNA evidence, and emphasized the lack of DNA evidence in closing argument. Esposito argues that they should have hired an expert to opine that Davis's injuries were caused not by a tree limb, but by a man-made object—as Arden did at the evidentiary hearing on Esposito's state habeas petition. But the mere fact that counsel called no such expert does not mean their performance had to have been deficient. Counsel instead focused on attacking the state's forensic evidence or lack of it by retaining an expert to prepare them to challenge the state's evidence, including through cross-examination of its witnesses. They then reinforced their points in closing

18

argument. Counsel were permitted to make the strategic decision not to call an expert and instead challenge the state's forensic evidence through other means, and we cannot now second guess that strategy. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [this Court] will seldom, if ever, second guess." (internal quotation marks omitted)). In any event, counsel were not required to pursue every forensic theory "until it [bore] fruit." *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir. 1984) (internal quotation marks omitted)).

But even if counsel's performance was deficient, Esposito's argument still fails because he cannot show he was prejudiced by that deficiency. *See Strickland*, 466 U.S. at 694. We see no reasonable probability that additional forensic evidence about the murder weapon would have led to a different result. Even if the jury had heard expert testimony that a man-made object could have caused Davis's injuries, it would be obliged to weigh that evidence against contradictory evidence suggesting that Davis was murdered with the tree limb. *See Johnson v. Alabama,* 256 F.3d 1156, 1172 (11th Cir. 2001) (explaining that "federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing

19

the evidence"). This evidence included Knight's testimony that Esposito confessed during a post-arrest interview to having murdered Davis with a tree limb, the state's forensic analyst's testimony that Davis's hairs were found on the tree limb, and the autopsy doctor's testimony that her injuries were consistent with being hit by an item with bark on it. Indeed, Arden could not rule out the possibility that a tree limb caused Davis's injuries. And uncontradicted evidence—including footprints, palm prints, fingerprints, and a cigarette butt—placed Esposito at the murder scene. Given this strong evidence of guilt, there is no reasonable probability that additional forensic evidence would have made a difference in the outcome of Esposito's trial. *See Fortenberry v. Haley*, 297 F.3d 1213, 1228 (11th Cir. 2002) (the failure to present exculpatory evidence is more likely to be prejudicial when the conviction is based on little evidence of guilt). Accordingly, Esposito cannot establish prejudice from counsel's failure to present the testimony of a forensic expert.

2. *Deficient investigation and presentation of evidence related to Woodward's background and character*

Next, Esposito asserts that his counsel were deficient for failing to discover and present evidence showing that Woodward had a dominating and aggressive personality and was physically larger than Esposito—all of which would have supported their theory that she coerced Esposito to commit the murders. He points

20

to the affidavits he presented in his habeas proceedings indicating that while he was a follower, Woodward was domineering, possessive, and violent.

The state habeas court reasonably applied *Strickland* in concluding that Esposito failed to show that trial counsel conducted a deficient investigation into Woodward's background. *See* 28 U.S.C. § 2254(d)(1); *Strickland*, 466 U.S. at 688. The record shows that Kelly and Roberts hired Guevara, who investigated Woodward's past by speaking with her friends, family, and employers. He also interviewed Esposito's friends and family about her. The fact that Guevara could have discovered other witnesses who knew Woodward is not enough to establish that counsel's investigation was deficient. *See Solomon*, 735 F.2d at 402.

Esposito also contends that his counsel's presentation of evidence related to Woodward's culpability was deficient. He argues that they made only minimal efforts to present evidence that Woodward was more culpable due to their concern about opening the door for the state to use his videotaped confession as rebuttal evidence. He argues that counsel's efforts to avoid admission of the videotaped confession in rebuttal were unreasonable because the confession was inadmissible for that purpose.

Esposito is correct that the videotaped confession would have been inadmissible for rebuttal purposes because the confession was obtained in violation of his *Miranda* rights. *See James v. Illinois*, 493 U.S 307 (1990) (recognizing that

21

an illegally obtained confession may be introduced only for purposes of impeaching the defendant and not for rebutting defense witness testimony).  But even assuming that counsel's mistaken belief about the admissibility of the confession rendered their representation deficient, Esposito has failed to show that he was prejudiced by that deficiency.  *See Strickland*, 466 U.S. at 694.  He cannot show prejudice because the jury did, in fact, hear evidence that highlighted Woodward's relative culpability in the crime.  For instance, the jury heard that Woodward was larger physically than Esposito, approached Davis initially, drove Davis to the murder site, and booked and paid for their hotel rooms during the crime spree.  And for what it's worth, the jury heard from witnesses (Esposito's psychiatric nurse and therapist) who were unconvinced that Esposito—and not Woodward—murdered Davis.  In short, because the jury heard testimony about Woodward's physical dominance and leadership role in the crime, we cannot say it was reasonably probable that any additional evidence of that nature would have made a difference in the outcome of the trial.  *See id.*  This is particularly so given the overwhelming evidence of his guilt, including his confession to Knight.  *See United States v. Andrews*, 953 F.2d 1312, 1327 (11th Cir. 1992) (holding, in a direct appeal, that the defendant was not prejudiced by his trial counsel's failure to call additional witnesses because the evidence of his guilt was overwhelming).

Esposito therefore failed to show that he was prejudiced by counsel's presentation of evidence related to Woodward's culpability.

## B. Failure to Investigate and Present Mitigating Evidence

Esposito next argues that his counsel were ineffective for failing to properly investigate and present in the penalty phase of his trial mitigation evidence that may have convinced the jury not to recommend a death sentence. He explains that counsel should have discovered and presented testimony from additional witnesses who could have corroborated his claims of physical, verbal, and sexual abuse while he was a child, as well as the psychological damage inflicted by that abuse. He contends that had the jury received an accurate picture of his abuse and mental illness, there was a reasonable probability that at least one juror would have voted to impose a sentence less than death, resulting in a recommended sentence of life imprisonment. *See* O.C.G.A. § 17-10-31(c). In rejecting this claim, the state habeas court concluded that Esposito's trial counsel's investigation and presentation of the evidence were adequate, and their failure to uncover every potential witness did not render their representation deficient.

Esposito has failed to show that the state habeas court's denial of this claim was an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). The record shows that, in preparation for the mitigation portion of the trial, counsel hired an investigator, Guevara, who conducted an extensive investigation into

23

Esposito's background by interviewing over 80 witnesses, including his family members, friends, teachers, psychiatrists, and social workers. Guevara presented his findings from these interviews to counsel in thorough written reports that detailed Esposito's childhood abuse and psychological issues. Given this extensive investigation, it was reasonable for the state habeas court to conclude that counsel were not deficient in investigating potential mitigation evidence for the penalty phase.

Nor was it unreasonable for the state court to conclude that there was no deficiency in counsel's presentation of the mitigation evidence. Counsel were permitted to make strategic decisions about which witnesses to call. *See Conklin*, 366 F.3d at 1204. The witnesses counsel called in mitigation described the physical and sexual abuse Esposito suffered, as well as his attendant psychological issues. Esposito contends that it was unreasonable for counsel not to call Veach, but we disagree. Although counsel had intended to call Veach and planned to pick her up at the airport, the plan went awry when she could not be found, and as a result she arrived at the courthouse at the end of the penalty phase. By then, counsel had no time to prepare her to testify. At that point, counsel's decision not to call her as a witness was not unreasonable. That counsel may have been able to avoid the mishap with more careful planning and execution does not make their performance deficient under *Strickland*.

24

Counsel's decisions to call certain witnesses but not others were made after a thorough investigation into Esposito's childhood abuse and mental illness. Esposito thus has failed to show that the state habeas court's rejection of this claim was an unreasonable application of *Strickland*.

## C. Inadequate Closing Argument in Penalty Phase

Lastly, Esposito argues that he was denied effective assistance of counsel during the penalty phase because his counsel's brief closing argument was inadequate. He explains that the closing argument failed to reference the mitigating circumstances in evidence and "gave jurors no cogent basis on which to impose a sentence less than death." Appellant's Br. at 70. The state habeas court summarily rejected this claim.

Esposito has failed to show that there was no reasonable basis for the state habeas court to reject this claim. *See Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). Even if counsel's closing argument was deficient, Esposito has not shown that he was prejudiced by that deficiency. *See id.* Esposito asserts that he was prejudiced by the inadequate closing argument because it "was the culmination of counsel's many failures up to that point and independently harmful." Appellant's Br. at 73. This cumulative prejudice argument fails for the

same reason as his other claim of ineffective assistance in the penalty phase—that is, counsel's performance in investigating and presenting evidence in mitigation was not deficient under *Strickland*. Esposito advances no argument explaining how he was prejudiced by his counsel's closing argument alone. Accordingly, he is entitled to no relief on this claim.

## IV.   CONCLUSION

For the above reasons, the district court's denial of Esposito's petition for a writ of habeas corpus is affirmed.

**AFFIRMED.**